THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CEDRIC E. HUNTER, Defendant-Appellant.

Second District No. 2—01—0406

Opinion filed June 28, 2002.

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, and Nancy A. Ostdiek, of Palm Bay, Florida, for appellant.

Paul A. Logli, State's Attorney, of Rockford (Martin P. Moltz and Lawrence M. Bauer, both of State's Attorneys Appellate Prosecutor's Office, of counsel), and Paul Benjamin Linton, of Northbrook, for the People.

JUSTICE O'MALLEY delivered the opinion of the court:

Defendant, Cedric E. Hunter, appeals his conviction of forgery (720 ILCS 5/17—3(a)(1) (West 2000)). On appeal, defendant contends that (1) the evidence was insufficient to convict him beyond a reasonable doubt; (2) the jury was prejudicially tainted by the comment of a potential juror in open court; and (3) he was prejudiced by the State's improper argument, which shifted the burden of proof to defendant. We affirm.

Defendant was indicted on one count of forgery. The indictment

alleged that on May 25, 2000, defendant knowingly and with the intent to defraud delivered a check that was capable of defrauding another to Teresa Smithee of the Kishwaukee Currency Exchange in Rockford. After discovery and several pretrial motions, the case proceeded to a jury trial on January 10, 2001.

During jury selection, the first panel of four jurors was selected and removed from the courtroom. While the next panel of four jurors was being selected, the trial court had the following exchange with potential juror Joseph Gaziano:

"THE COURT: You are a corrections officer employed by Winnebago County, is that correct?

JUROR GAZIANO: Yes, sir.

THE COURT: Is the fact that you are employed in that capacity going to have any bearing upon your ability to be fair and impartial in this case?

JUROR GAZIANO: I can't really say. I know [defendant]. I've known him for a while. I don't know.

THE COURT: Counsel.

JUROR GAZIANO: I can see how it would, yes."

The trial court immediately excused Gaziano. The second panel of four jurors was completed and then the trial court began questioning the last panel, whereupon it adjourned for the day.

When *voir dire* resumed, juror Linda Emberson was questioned. Defendant's counsel asked whether juror Emberson had formed any opinions regarding defendant. She indicated that she did not want to explain her opinion regarding Gaziano's comment in the presence of the other jurors. The following conversation with the trial court and counsel then occurred outside the presence of the other jurors:

"JUROR EMBERSON: One of the jurors that was questioned was a correctional officer. And he had stated—I do not know what the correct words that he stated. But he had stated that he had a couple of incidences [*sic*] or running into with [defendant]. And he didn't say that it was like a basketball game, so I—he led me to believe that this might not be the first time that [defendant] has been in court. And that doesn't—I don't have any opinion about you. And I believe I could be a fair juror. I'm very honest. And I believe in the facts have to be presented in order—his right is he is innocent until proven guilty, and I believe that. It would not sway my decision one way or the other. It was just more information than I thought I should have.

THE COURT: I believe his comment, and counsel you can correct me, based on our recollections, but my recollection of that is that the potential juror said that he knew [defendant]. I don't think he said more than that. I think he said he knew [defendant].

Mr. Morrison?

MR. MORRISON [DEFENSE COUNSEL]: I thought that he said that he had known him for a while, was what I remember him saying.

THE COURT: Okay.

JUROR EMBERSON: I'm sorry. I took it that he had—see I don't remember what he said. But the way I took it, and maybe it was my thinking that he's a correction officer—

MS. LARSON [ASSISTANT STATE'S ATTORNEY]: Sure.

JUROR EMBERSON: But I don't feel in any way that you, you know, are a bad person. And I'm not judging you. I just felt at the time he was saying that he was a correction officer and he had several contacts with him.

THE COURT: Would that make any difference in your ability to be impartial in this case?

JUROR EMBERSON: No. No. It would not. I just wanted to let you know that this was information that I thought I was given that I shouldn't have been.

THE COURT: Okay.

JUROR EMBERSON: But, no, I do feel that I could be fair. And I am an honest person. I only base things on facts.

THE COURT: Counsel, do either of you have any other questions on this subject that you want to broach with Miss Emberson outside the presence of the other jurors?

MR. MORRISON: I don't have anything more than what you've already asked, Judge.

THE COURT: All right. Miss Larson.

MS. LARSON: So your conclusion that this must have been in a correctional setting was based on him saying that he knew [defendant] or had encountered him in the past and his job?

JUROR EMBERSON: Right.

MS. LARSON: So you're sort of making a logical inference from that?

JUROR EMBERSON: I assumed. I've really been going over this all night, thinking, you know, he didn't say that particularly, so why am I thinking that. But I just kind of felt if he—you know, like I said, if he had said we played basketball together or something, but the fact that he said I'm a correctional officer, and had I been paying more attention I would have jotted down what he said, because it struck me—at the time he said it, it struck me as like, hmm, why did he say that.

MS. LARSON: Okay. If Judge Gill would tell you that it was an innocent contact, would that change your opinion?

JUROR EMBERSON: I don't have an opinion.

MS. LARSON: Okay.

JUROR EMBERSON: I'm not—I'm not a judgmental person. I'm not saying that he's been in the corrections [*sic*]. This was the response that I had to his comment.

MS. LARSON: Okay.

JUROR EMBERSON: I guess maybe I felt like he was trying to lead—the correctional officer was trying to lead us into knowing that—that's how I felt at the time when he said that. I thought—if anything, I thought he was giving too much information.

MS. LARSON: Okay. All right. Are you going to hold this against [defendant]?

JUROR EMBERSON: No. Absolutely not. I believe in the defendant's rights. He is innocent until proven guilty.

MS. LARSON: Okay. I have nothing more, Judge.

MR. MORRISON: No.

THE COURT: Okay. Let's go back into the courtroom."

Following this exchange and in the presence of the other jurors, *voir dire* continued. Juror Emberson stated that she would vote for acquittal if the State failed to prove each and every element of its case beyond a reasonable doubt. She also stated that, if she were in defendant's place, she would want herself on the jury because she was honest and fair-minded, and would listen to all of the evidence in the case before coming to a conclusion.

Later during *voir dire* for the selection of an alternate juror, another prospective juror, Judith Tenney, revealed to the trial court out of the presence of the other jurors that she had been influenced by Gaziano's comments and would be unable to put that information aside. The trial court excused Tenney.

During and following *voir dire*, defendant did not move to excuse juror Emberson or any of the other jurors who had heard Gaziano's comment for that reason. Further, defendant did not ask that any of those jurors be questioned regarding the impact of Gaziano's comment on their ability to be objective.

The case proceeded to trial. Teresa Smithee, manager of the Kishwaukee Currency Exchange in Rockford, testified that on May 25, 2000, she was working at one of the drive-up windows. Shortly before noon, a late-model, white, four-door compact Oldsmobile drove up to her window. There were three people in the car, a female driver, a passenger in the front seat who Smithee initially stated was male, and a male passenger in the backseat. When Smithee's attention was directed to her statement to the police on the day of the incident, she identified the front seat passenger as a female. The car pulled up beyond the drawer so that the rear passenger seat was even with the drawer. Smithee testified that the passenger in the backseat placed a check and a traffic ticket (for identification in lieu of a driver's license)

in the drawer. Smithee identified defendant as the passenger in the backseat and the person who had placed the check and ticket in the drawer.

Upon examining the check, Smithee became suspicious because she did not recognize the name of the company on the check. The check purportedly had been issued by Pro-Pack, a Northbrook, Illinois, company and was a payroll check. Further, the check appeared to have been typed rather than generated by a machine and was hand signed instead of having a machine-stamped signature. Smithee was also unable to read clearly the name of the person who had signed the check. In addition to the suspicious characteristics of the check, Smithee noted that the traffic ticket was unreadable and that the name on the ticket appeared to have been altered. Smithee asked defendant for additional identification, but defendant did not respond to her question.

In an attempt to verify the genuineness of the check, Smithee and her coworker called the bank on which the check had been drawn and the company that purportedly issued the check. She told defendant that she was on hold. After a few minutes had passed, the vehicle in which defendant was waiting pulled into the parking lot of the currency exchange. Defendant entered the lobby of the currency exchange and asked what was taking so long. After asking this question, defendant left the building, leaving the check and the traffic ticket with Smithee. Shortly after this, the vehicle in which defendant was riding left the currency exchange.

Smithee provided the police with a description of the occupants of the vehicle and the vehicle's license plate number. On July 10, 2000, Smithee identified defendant's photograph from a four-picture photographic lineup. She testified that she picked defendant's photo without hesitation.

Betty Burton testified next. She testified that she worked for Pro-Pack, the purported payor of the check. Burton handles accounts receivable and payable for Pro-Pack. Burton testified that the check defendant attempted to cash on May 25, 2000, was not issued by anyone authorized to sign checks by her company. "Linda McCall," who purportedly signed the check, was not an employee of Pro-Pack and was not authorized to sign checks on behalf of Pro-Pack. The name of the payee, "Billy R. Scott," was unknown to Burton and did not have any business relationship with Pro-Pack. Similarly, defendant was unknown to and had no business relationship with Pro-Pack. Burton also testified that the check had been drawn on a closed account.

Daniel Balsley, an Illinois State Police trooper, testified that on April 17, 2000, he issued a ticket to defendant for not wearing a seat

belt. Balsley identified the unaltered ticket in court. Balsley testified that defendant signed the unaltered ticket in his presence on the date it was issued.

The parties stipulated that a qualified questioned-documents examiner had examined copies of the check and the traffic ticket. In the examiner's opinion, defendant had not signed either the front of the check or the back of the check, and two different individuals were responsible for the signatures on the front and the back of the check.

Next, defendant testified in his own behalf. Defendant testified that on May 25, 2000, he was living at the Rockford Motel. He kept his copy of the traffic citation in a desk drawer in his motel room. A woman by the name of Tina Bayliss visited him on that date accompanied by a woman whom defendant knew only as "Sharee." While the two women were in his room, defendant stepped into the bathroom for a few minutes. After he exited the bathroom, Tina Bayliss asked him if he would like to accompany her while she cashed a check at the local currency exchange. Defendant agreed and the three of them left in Sharee's mother's car. In the car, defendant sat in the backseat by himself.

Defendant testified that, when they stopped at the drive-up window of the currency exchange, the car stopped with the driver's window next to the sliding drawer and not with the rear passenger window next to the sliding drawer. According to defendant, Tina Bayliss, the front seat passenger, reached across Sharee, the driver, and placed the check and a traffic ticket into the drawer. Defendant testified that he did not know whose ticket it was. He also testified that he did not touch the check when it was given to Smithee at the currency exchange or know that it had been forged.

After waiting next to the drive-up window for about 10 minutes, Tina Bayliss told Sharee to pull up by the door of the currency exchange. At that point, Sharee said that she had to return her mother's car and asked defendant to go into the currency exchange and find out what was taking so long. Defendant testified that he entered the currency exchange and asked Smithee what was taking so long. Defendant testified that Smithee told him she was calling to clear the check. Defendant returned to the car and told Tina Bayliss that she needed to go into the currency exchange and speak to Smithee about the check. At that point, Tina Bayliss instructed Sharee to drive off.

On cross-examination, defendant was questioned as to when he first noticed that the ticket was missing. Defendant testified that he first noticed that his ticket was missing after he returned to his motel. Defendant admitted that he never reported the loss or theft of his ticket.

In rebuttal, the State introduced evidence of defendant's previous convictions of possession of a stolen motor vehicle, possession of burglary tools, and theft.

Defendant was found guilty of forgery. Thereafter, the trial court held a sentencing hearing. At the sentencing hearing, Donald Allen, an employee of Treatment Alternatives for Safe Communities (TASC) testified that he had evaluated defendant for admission to the TASC program. Allen had prepared a report that noted that defendant had admitted he committed the crime in order to obtain money to finance his continued substance abuse. Allen also testified on cross-examination that defendant admitted to him that he had committed the crime to support his substance abuse habit.

Defendant also testified at the sentencing hearing. Defendant testified about his history of substance abuse and stated that on May 25, 2000, he was using cocaine in his motel room with Tina Bayliss and her friend. Defendant admitted that his purpose in going to the currency exchange was to "obtain more currency for more crack cocaine." Defendant was sentenced to a five-year term of imprisonment. Defendant timely appeals.

■ On appeal, defendant first contends that the State failed to prove him guilty of forgery beyond a reasonable doubt. We disagree. In reviewing a sufficiency of the evidence claim, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all of the elements necessary to establish the elements of the offense beyond a reasonable doubt. *People v. Smith*, 149 Ill. 2d 558, 565 (1992).

■ In response to defendant's contention, the State argues that defendant made a judicial confession of his guilt during the sentencing hearing. Where a defendant has made a judicial confession, he cannot maintain a claim that the evidence against him was insufficient to support his conviction. *People v. Green*, 17 Ill. 2d 35, 42 (1959). A judicial confession is a voluntary acknowledgment of guilt during a judicial proceeding, such as a plea of guilty, testimony at trial, or testimony at some other hearing. *Green*, 17 Ill. 2d at 41-42. Such a judicial confession is binding upon the defendant and may result in the waiver of the production of all evidence of the defendant's guilt. After such a confession, a defendant "may not question the legal sufficiency of the evidence against him." *Green*, 17 Ill. 2d at 42.

■ At his sentencing hearing, defendant merely stated that his "purpose" in going to the currency exchange was to obtain money in order to be able to get more drugs. We conclude that this was not a judicial confession of defendant's guilt. This statement is consistent with defendant's position that he was along for the ride with Tina

Bayliss and that she passed the bogus check, as the group collectively could have obtained money from the currency exchange to obtain more drugs. Therefore, we reject the State's argument. We must therefore consider the sufficiency of the State's evidence against defendant.

■ After reviewing the record, we conclude that the evidence produced by the State is abundantly sufficient to prove defendant's guilt of forgery beyond a reasonable doubt. The essential elements necessary to prove forgery in this case are (1) a document apparently capable of defrauding another; (2) a making or altering of such document by one person in such manner that it purports to have been made by another; (3) knowledge by defendant that it has been thus made; (4) knowing delivery of the document; and (5) intent to defraud. *People v. Hockaday*, 93 Ill. 2d 279, 282 (1982). Intent to defraud may be inferred from the circumstances of the transaction and, if the forged document is delivered, then the intent to defraud will be presumed. *People v. Carr*, 225 Ill. App. 3d 170, 176 (1992). Defendant contends that there was insufficient evidence to prove that defendant knew that the check had been forged, that he knowingly delivered the check, or that he possessed the intent to defraud. These arguments are contradicted by the record.

■ Smithee testified that the vehicle in which defendant was riding as the backseat passenger pulled up to the window of the currency exchange so that the sliding drawer was accessible from the rear passenger window. She testified that the passenger in the rear seat of the car placed a check and a traffic ticket into the sliding drawer. Further, Smithee identified defendant as the person who placed the check and the ticket into the drawer both in court and during a photographic lineup. Moreover, Smithee testified that she had no hesitation in identifying defendant in the photographic lineup. Thus, there was clear and unequivocal testimony that defendant was the person who delivered the check to the currency exchange.

In addition, defendant was the only male in the car. The fact that "Billy" is much more commonly a male name supports a reasonable inference that bolsters Smithee's testimony that defendant was the person who delivered the forged check. The jury reasonably could have concluded that defendant knowingly presented the check to the currency exchange, and once defendant delivered the check, his intent to defraud is presumed. Further, defendant's actions of inquiring as to the delay in cashing the check followed by the immediate departure of defendant in the vehicle without either the check or the ticket suggest that defendant was aware of the problems with the check and fled with guilty knowledge. Thus, from the facts and circumstances sur-

rounding defendant's transaction, a reasonable juror could have found the essential elements of the crime beyond a reasonable doubt.

Defendant next argues that he was prejudiced by the jury selection process in which Gaziano, a corrections officer, stated in front of a number of potential jurors ultimately selected to serve on defendant's jury that he knew defendant. Defendant argues that Gaziano's statement was the functional equivalent of the disclosure of some unspecified prior conviction, as the inference to be drawn from the comment was that Gaziano knew defendant as a result of his employment as a corrections officer. Defendant is concerned not with the juror who stated that she could remain impartial despite learning of the correction officer's prior contact with defendant (which she assumed occurred on the job), but with the other eight jurors who did not volunteer their concerns and who were not questioned regarding their abilities to remain impartial even though they had heard Gaziano's comment. According to defendant, the trial court's failure to inquire of the other jurors about the effect of Gaziano's comment deprived him of his right to an impartial jury. We find, however, that defendant has waived this error for failing to object in the trial court.

■ Generally, in order to preserve an error for review, a defendant is required to make a timely objection at trial and to raise that same objection in a written posttrial motion; a defendant's failure to do either operates to waive the defendant's right to raise the issue as a ground for reversal on review. *People v. Herrett*, 137 Ill. 2d 195, 209 (1990). Specifically, errors made during *voir dire* are governed by the waiver rule. *People v. Campbell*, 264 Ill. App. 3d 712, 728 (1992). Here defendant accepted all of the jurors following Gaziano's comment and did not ask the trial court to excuse the potential jurors who had heard the comment or in any other way object to selecting the jurors from the venire after Gaziano's comment. Thus, defendant has waived this error on review.

■ Defendant urges that we review this error under the plain error exception. 134 Ill. 2d R. 615(a). Rule 615(a) provides a limited exception to the waiver rule and allows a reviewing court to consider plain errors affecting substantial rights that were not properly preserved in the trial court. *Herrett*, 137 Ill. 2d at 209. A court will consider a trial error under the plain error exception where the evidence in the case is closely balanced or where the error is so fundamental and of such a magnitude as to deny the defendant a fair trial. *Herrett*, 137 Ill. 2d at 209-10. Initially, we note that the evidence in this case is not closely balanced, as the evidence against defendant is overwhelming. Therefore, we need not consider the assigned error under this prong of the plain error analysis. We therefore turn to the

second prong of the plain error analysis, whether there was error, the existence of which would implicate the integrity of the judicial process and deprive defendant of a fair trial.

■ Here, Gaziano stated only that he knew defendant. He did not elaborate about how he knew defendant or if his acquaintance with defendant occurred during the course of his official duties or if he had met defendant in some other fashion. We acknowledge that one potential juror volunteered that she had been improperly influenced by Gaziano's comment. Nevertheless, we do not conclude that this comment, even standing alone, tainted any of the other prospective jurors who heard it. Thus, we find no error arising from Gaziano's comment, let alone plain error requiring our review despite defendant's waiver. Further, even if there were error from this comment, we note that each prospective juror was questioned extensively regarding his or her ability to be fair and impartial and to keep an open mind until the evidence had been fully presented. Last, the trial court instructed the jury as to the law, and these instructions emphasized that the jury was to decide the case only on the evidence presented in court. In light of all of the circumstances regarding the jury selection process in this case, we conclude that, even if there were error arising from the trial court's handling of Gaziano's statement, it was not of such a magnitude to deprive defendant of a fair trial, especially in view of the thrust of the *voir dire* questioning conducted by the trial court and the parties.

Defendant's argument that the trial court should have specifically questioned each potential juror who heard Gaziano's statement to determine that he or she could nevertheless be fair and impartial is without merit. Such *sua sponte* conduct by the trial court may well have served to highlight the comment to the remaining potential jurors and thereby exacerbate the problem the trial court would have been attempting to cure, as well as lead defendant to raise the same issue on appeal, albeit for a different reason. A trial court is faced with many issues of this nature during the course of a trial. In *voir dire* specifically, the trial court is vested with broad discretion (*Campbell*, 264 Ill. App. 3d at 729), and its determination as to the impartiality of the jurors is accorded great deference and will not be set aside unless it is against the manifest weight of the evidence. *Campbell*, 264 Ill. App. 3d at 727. We have already stated that we do not conclude that Gaziano's statement tainted the remaining prospective jurors who heard it. So, obviously, we conclude that the trial court's implicit conclusion, that the jury was impartial, is not manifestly wrong. Further, the questioning by the trial court and the parties adequately covered each juror's ability to be impartial and decide the case on the

evidence presented. We perceive no abuse of discretion in the trial court's decision not to specifically question each juror regarding the impact of Gaziano's statement and instead generally to question his ability to be impartial. Further, there is no evidence that any of the jurors were unable to be impartial, and the general tenor of questioning in *voir dire* as well as the trial court's comments and instructions throughout the course of jury selection and the trial served to cure any error there might have been.

■ Defendant last contends that he was prejudiced by the State's improper comments in its closing argument concerning his failure to present certain witnesses. Specifically, defendant contends that, when the prosecutor argued in rebuttal that defendant had not produced any evidence to support his theory that Tina Bayliss and Sharee used his traffic ticket and framed him for the crime, the State improperly shifted the burden of proof to defendant. We find that defendant has once again waived our review of this issue.

During its rebuttal closing argument, the State argued:
"No evidence was produced to support the defendant's claims.

The defendant claims he was in the car with Tina Bayliss and a girl named [Sharee]. He knew her nickname, Rere. He knew what kind of car she drove. Yet there was no evidence produced to support his claim that he's somehow a hapless victim in this crime.

Why was there no evidence produced? Because, ladies and gentlemen, this is a fiction. This never happened. These people can't come forward to testify in support of his claim because it never happened. The defendant knew exactly what he was doing when he went to that currency exchange."
Defendant did not object to the argument.

As noted above, in order to preserve an error for review, a defendant must both object to the alleged error at trial and renew the objection in his written posttrial motion. *Herrett*, 137 Ill. 2d at 209. Here, defendant did not object to the State's argument at the time it was made. Consequently, defendant has waived our review of the error.

We also determine that the plain error exception will not apply to this alleged error. As noted above, the plain error exception of Rule 615(a) applies where the evidence of guilt is closely balanced or where the error affects a fundamental right and prevents a fair trial. Here the evidence was not closely balanced. We therefore turn to considering whether there was error and, if so, its magnitude.

In defendant's closing argument, defendant attempted to shift the responsibility for the crime from himself to Tina Bayliss and Sharee. He suggested that Tina Bayliss and Sharee went through the drawers

in his motel room in order to find some form of identification they could use to pass the "Billy R. Scott" check. Defendant also argued that it was Tina Bayliss who altered defendant's traffic ticket as well as passed the forged check to the currency exchange. The State's argument replied to defendant's argument. The State is given wide latitude in closing argument and its remarks are acceptable if they have been invited by the defendant. *People v. Crane*, 308 Ill. App. 3d 675, 687-88 (1999). Here, as the State's argument was invited by defendant, there is no error arising from it.

Moreover, the trial court instructed the jury that closing arguments were not evidence and that the State was required to prove each element of the crime beyond a reasonable doubt. As jury instructions may cure improper prosecutorial remarks (*Crane*, 308 Ill. App. 3d at 689), no prejudice accrued to defendant as a result of the State's remarks. Accordingly, any error was not of such a magnitude to require review under the plain error exception of Rule 615(a).

For these reasons, we affirm defendant's conviction in the circuit court of Winnebago County.

Affirmed.

BYRNE and CALLUM, JJ., concur.