No. 2--02--1005

______________________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

______________________________________________________________________________

THE PEOPLE OF THE STATE ) Appeal from the Circuit Court of Du Page

OF ILLINOIS, ) County.

)

Plaintiff-Appellee, )

) No. 00--CF--2751

v. )            

)

WILLIAM V. STEWART, ) Honorable

) George J. Bakalis,

Defendant-Appellant. ) Judge, Presiding.

______________________________________________________________________________

JUSTICE CALLUM delivered the opinion of the court:

I. INTRODUCTION

A jury found defendant, William V. Stewart, guilty of aggravated criminal sexual abuse (720 ILCS 5/12--16(d) (West 2000)) and criminal sexual assault (720 ILCS 5/12--13(a)(4) (West 2000)), and the trial court sentenced him to consecutive terms of 7 and 10 years' imprisonment, respectively.  On appeal, defendant argues that (1) the trial court erred by refusing to suppress recorded telephone conversations between defendant and the victim, (2) he was denied his right to an impartial jury because the trial court recited in detail to the venire the allegations in counts of the indictment that were dismissed before the trial and because the prospective jurors heard the remarks of other prospective jurors about the reprehensible nature of the offenses as charged, (3) the trial court erred in admitting photographs of the victim and of defendant's apartment, and (4) he is entitled to an additional day of credit against his sentence and a $365 credit against his fines.  We grant defendant an additional day of sentencing credit and a $200 credit against his fines but affirm in all other respects.

II. BACKGROUND

Shortly after bringing in the prospective jurors, the trial court read the charges to them.  Count II of the indictment alleged that defendant committed aggravated criminal sexual abuse by fondling the sex organ of the victim, Keith D., for the purpose of the sexual gratification or arousal of defendant. 
 Counts VI, VII, and VIII alleged that defendant committed criminal sexual assault by placing his mouth on Keith D.'s penis.  Counts IX, X, and XI alleged that defendant committed criminal sexual assault by placing his finger in Keith D.'s anus.  Counts XII, XIII, and XIV alleged that defendant committed criminal sexual assault by placing his tongue in Keith D.'s anus.  After reading the charges, the trial court admonished the venire that defendant was presumed innocent until the State proved his guilt beyond a reasonable doubt and that the indictment should not be considered as evidence against defendant.

When asked if there was anything about the nature of the charges that would cause them to be less than impartial, several prospective jurors answered affirmatively.  Prospective juror No. 45 stated, "I have a young kid.  I am very protective and situations like that bother me.  ***  Visions of my kid having these problems, I am not saying it would happen, but I would be prejudiced, I am very protective of any children."

Prospective juror No. 42 stated, "When I was a very young child, I was in the very situation.  It was an adult that was in charge and very close."  Defense counsel objected, and the trial court continued the examination outside the presence of the venire.

The following exchange occurred during the trial court's examination of Prospective juror No. 15:

"A. No, I am very disgusted of [
sic
] what I heard.  I think a violation of trust is just disgraceful.

Q. You understand those are the allegations in this case?  It hasn't been proved?

A. I have just been walking around in your parking lot, trying to calm myself down from--

MR. MARTIN [defense counsel]: Objection, Judge.

JUROR: --being very upset.

THE COURT: Q. The question I need to know from you, sir, are you capable, if you were a juror in this case, [of] listening to the evidence and deciding the case solely based on the evidence that you hear in this case, or is the very nature of the charge such that you could not do that?

A. I could not do it."

The trial court dismissed each of these prospective jurors.  Immediately after the trial court dismissed prospective juror No. 15, defense counsel requested a conference outside the presence of the venire.  The trial court obliged, and defense counsel expressed concern over how defendant was going to receive a fair trial in light of the prospective jurors' comments, which counsel argued were creating a "very damaging sentiment."  He requested that the court identify the prospective jurors who might have similar concerns and examine them outside the presence of the other prospective jurors.  The trial court responded that it would conduct a sequestered examination of prospective jurors only if there were an indication that a person could not be impartial.

After the first six jurors were selected, the trial court brought in a new group of prospective jurors.  Again, the trial court read the charges to the venire and gave them the same instructions that the first group received.  During the examination of this second group, if a prospective juror stated that there was something about the charges that would cause him or her to be less than partial, the trial court stopped the questioning and continued the examination outside the presence of the other prospective jurors.

After the jury was selected but before the trial began, the State nol-prossed counts XII, XIII, and XIV of the indictment.  Apparently, shortly before the trial, Keith stated that he could no longer remember the incident that formed the basis for counts XII, XIII, and XIV.
  The trial court informed the jury that those counts, which had been read the previous day, were not going to be presented and instructed it to disregard those charges.

During the trial, the parties stipulated that Keith was born in September 1985 and defendant was born in August 1957.  Keith's mother, Kimberly K., testified that in 1999 she became a friend of defendant.  Defendant worked with Chris K., the brother of Kimberly's fiancé, Mark K.  Defendant was a friend of Chris and his wife, Natalie, and often attended family functions at their home in Wheaton.  Defendant lived in an apartment in Lombard, was not married, and had no children.  Kimberly and Keith lived in DeKalb with Mark.  At the time, Mark was in the process of earning his Ph.D. and therefore did not have much time to spend with Keith.  Keith was withdrawn and awkward, had few friends, had attention deficit disorder, and had been receiving counseling.  Kimberly had learned that Keith and defendant had common interests, such as motorcycles and video games.

In July or August 1999, Kimberly and Keith attended a party at Chris's home.  Kimberly became upset when she saw Keith sitting on defendant's lap.  Defendant had his arms around Keith.  Kimberly ordered Keith to get up and told defendant that he should have known that such behavior was inappropriate.  During the Labor Day holiday 1999, defendant invited Keith and Kimberly to attend a motorcycle racing event, but Kimberly declined.  Kimberly and Keith celebrated Thanksgiving at Chris's house.  Defendant was present and told Kimberly that he did not really have any male friends,
 he missed Keith, who reminded defendant of himself when he was younger, and he would like to be Keith's mentor.  Because Keith did not have a male adult role model in his life, Kimberly was receptive to defendant's idea.

In December 1999, defendant invited Keith to spend time with him.  Defendant picked up Keith at Chris's home and took Keith to his place of employment.  Afterwards, defendant called Keith several times.  On January 16, 2000, Kimberly dropped off Keith at a shopping mall, and defendant picked him up and took him to a video game arcade.  Late in January 2000, defendant asked Kimberly if Keith could spend the weekend at his apartment.  Because Keith seemed excited about the idea, Kimberly agreed. From January through March 2000, Keith spent two or three weekends at defendant's apartment.  In February 2000, defendant took Kimberly, Mark, and Kimberly's two other children, Niki and Josh, to a motorcycle show.

At some point, Keith's behavior changed.  Keith avoided talking to defendant over the telephone and stated that he did not want to spend time with defendant.  Kimberly asked Keith if everything was okay, and Keith responded that everything was fine and he just did not want to be with defendant.  Keith's grades began to suffer, and Kimberly told defendant that Keith's grades were the reason why Keith could not spend time with him.

Defendant frequently called, wrote, and sent e-mails requesting to see Keith and blamed Kimberly for interfering in defendant's and Keith's relationship.  In March 2000, Kimberly was to receive her confirmation in the Catholic church and planned to baptize her three children.  She asked defendant to be Keith's godfather.  Keith stated, however, that he did not want defendant to be his  godfather.  Defendant gave a $50 baptism gift to Keith but not to Kimberly's other children.

Keith's interest in seeing defendant continued to fade.  Kimberly told Keith that, if he did not want to continue to see defendant, she would "take the blame."  Keith agreed, and Kimberly "cut it off."

In May 2000, defendant offered to give Kimberly and Mark two airline tickets to go anywhere if they would let defendant take Keith to Disney World as a graduation present.  Keith did not want to go, and Kimberly did not want Keith to go.  In May or June 2000, defendant showed up with a "wave runner" at Kimberly's home and invited her and her family to come with him.  Shortly thereafter, Mark arrived home, and the invitation was declined.

About two weeks later, defendant asked to talk to Kimberly in person.  Kimberly and Mark met defendant at a restaurant in De Kalb.  Kimberly told defendant that Keith did not want to see him.  Defendant said that he missed Keith, was sorry, and wanted Kimberly to forgive him and give him another chance.  Kimberly asked, "Why should we give you another chance?  What did you do?"  Defendant merely kept replying, "I'm sorry, I'm sorry."  Kimberly told defendant that she would call the police if he had any contact with Keith.

In September 2000, Keith received a birthday card and a typed letter from defendant.  The card contained $10 and two movie tickets.  The letter stated in pertinent part:

"It hurts me to think that you are afraid of me or that you think I would hurt you.  I have never hit you, threatened you, or forced you to do anything, so I don't understand, why you would think that. *** I am sorry if I hurt you in anyway [
sic
], I never meant to."

Kimberly did not show the card to Keith.  Shortly thereafter, defendant called Kimberly at work, apologized, and asked for another chance.  Kimberly replied that she and her family did not want to have anything to do with him.  An argument ensued, and Kimberly's boss ended up taking the telephone from her and hanging it up.

Late in September 2000, Kimberly went to the De Kalb police department, initially to seek a restraining order against defendant.  The De Kalb police referred Kimberly to the Lombard police department.

Keith testified that he became familiar with defendant while attending family functions at Chris's and Natalie's home.  Keith and defendant talked and discovered they had common interests.  Eventually, Keith and defendant arranged a social outing.  They went to a video game arcade for a couple of hours, and afterwards Keith stayed with Chris and Natalie.  The following day, Keith and defendant met again and went to an arcade, and then Keith went home.  Defendant did audio/visual work, and on one occasion defendant took Keith to a site where defendant was setting up equipment.

Defendant and Keith called each other two to three times a week and socialized together about once every two weeks.  Keith and defendant went to arcades, went swimming, and watched movies at defendant's apartment.  Keith enjoyed spending time with defendant and considered him a friend.

Keith first spent the night at defendant's apartment in January 2000.  Defendant picked up Keith at home and drove him to Lombard.  While at defendant's home, Keith used defendant's computer and watched action movies.  Keith testified that he spent about every other weekend at defendant's apartment and sometimes more frequently once he finished school for the summer.  Every time that Keith visited, defendant gave him a toy or a stuffed
 animal.

On one occasion, Keith told defendant that he was curious about pornographic films, and defendant rented one.  Keith and defendant watched such movies on more than one occasion.  When Keith stayed at defendant's apartment, he slept on the couch.  During Keith's second overnight visit, defendant asked Keith if he wanted to sleep in defendant's bed.  Keith declined and never slept in the bed.

Keith experienced chronic back pain and asked defendant for back massages.  Defendant suggested that Keith lie on defendant's bed and remove his shirt.  The first time Keith received a massage, defendant massaged only Keith's back.  While giving Keith a second massage, defendant suggested that Keith remove his pants so that defendant could massage his legs.  Keith removed his pants but not his underwear.  Defendant massaged Keith's legs and then began to massage Keith's buttocks over his underwear.  Keith thought that this was "weird" and therefore rolled over onto his back.  The massage ended, and Keith dressed.

On another occasion, Keith was ready to go to sleep on the pull-out bed in defendant's living room when defendant gave Keith another massage.  A pornographic film was playing at the time.  Keith removed his pajamas and was dressed only in his underwear.  Defendant began massaging Keith's back and legs.  He then rolled Keith onto his back, removed Keith's underwear, and began massaging Keith's penis.  Defendant said that it was part of a full body massage.  When Keith became erect, defendant put his mouth on Keith's penis until Keith ejaculated.  Defendant then sat on the side of the bed and masturbated.  Defendant said that he could go to jail and asked Keith to promise not to tell anyone about what they had done.

Keith estimated that defendant gave him massages during more than half of the occasions that Keith spent the weekend.  Defendant touched Keith's penis during 25% to 50% of those massages.  There were one or two other occasions when defendant put his mouth on Keith's penis while they were in defendant's bedroom.  On one occasion, after defendant had used his hand to massage Keith's penis, defendant stated that it was only fair that Keith did the same to him.  Keith touched defendant's penis but quickly removed his hand.  These incidents always began with massages
.  During one massage, defendant kissed Keith's nipples.  On another occasion, while Keith and defendant were in the living room, defendant put some type of liquid on his finger and inserted it into Keith's anus.  After this, Keith told defendant that he did not want any more massages
, and defendant stopped giving them.

On one occasion, defendant and Keith were in a hurry to get somewhere, and defendant suggested they shower together to save time.  Defendant washed Keith and did not start washing himself until after Keith left the shower.  No sexual contact occurred, however.

By the spring of 2000, Keith began making more friends and had a girlfriend.  Accordingly, he often had other plans when defendant called to invite him to do something.  Keith visited defendant one more time but, because of the sexual activity, was not sure that he wanted to continue to be defendant
's  friend.  Keith had asked defendant to be his godfather, but he and Kimberly later decided that it would be better to ask Keith's uncle.  Defendant invited Keith on a trip, but Kimberly did not approve.  Defendant frequently called and sent e-mail messages.  Mark ended up changing the family's Internet service provider.  Eventually, Keith spoke to defendant over the telephone and told him that he did not want to see him again.  Keith did not tell anyone about the sexual contact that occurred during the visits.

Robert Holguin testified that he was a senior criminal investigator with the Du Page County Children's Center.  On September 28, 2000, he was called to the Lombard police department, where he spoke to Keith.  On October 5, 2000, Holguin obtained judicial authorization to overhear telephone conversations between Keith and defendant.  On October 6 and October 8, 2000, Holguin went to Keith's home and connected recording equipment to Keith's telephone.  Keith called defendant's cellular phone.  The tape recordings and transcripts of the conversations between Keith and defendant were introduced into evidence.

The following are excerpts from the October 6, 2000, conversation:

"[KEITH]: *** [M]y mom *** keeps on asking what you did to me.

MR. STEWART: What do you mean, what I did to you?

[KEITH]: Um. You know what we did.

MR. STEWART: What do you mean?  Playing around?

[KEITH]: 
Um-hum.

MR. STEWART: Did you tell her?

[KEITH]: 
No, *** I didn't tell her.  She's trying to send me to a psychiatrist *** to tell what you did to me.

MR. STEWART: Why does she think I did something to you?

[KEITH]: 
Because *** you wanted to see me like on a weekly basis--

MR. STEWART: Well, isn't that what friendship is all about?

* * *

[KEITH]: 
But what we did was not friends, what friends should do.

MR. STEWART: No, I know, but I told you that that's not the kind of friendship I wanted.  And then I mean it was my fault, it was kind of your fault, you know, asking me for the things you were asking me, I should have just said no.

* * *

[KEITH]: 
*** Well, I do miss going over to your house, but not the things that you did.

MR. STEWART: I know.  I mean, like I said, I didn't want that.  I honestly did not want that, but I can't change the past.  If I can't have a chance to be friends with you and prove it, you know I don't know what to do.  I mean, I never forced you, you never said no.

* * *

[KEITH]: 
But what you did was wrong.

MR. STEWART: I know it was wrong, Keith, what do you want me to say.  I already said I'm sorry, I don't know what you expect from me.

[KEITH]: 
But why *** did you bring sex into the relationship with me?

MR. STEWART: Keith, I gotta go.  I gotta go back to work.

* * *

[KEITH]: 
If we keep on being friends *** would you do any of those things?

MR. STEWART: No, I would not Keith.  I wanted to try to make it up to you but you would never go with me anywhere so I could prove it."

The following are excerpts from the October 8, 2000, conversation:

"[KEITH]: 
*** I'm confused about what happened between us.

MR. STEWART: Well, it never should have happened.

[KEITH]: 
And why is that?

MR. STEWART: *** Because of the age difference.  I mean, I care about you a lot and I love you a lot, and I wanted you to be like a son, not like a lover.

* * *

[KEITH]: 
But you treated me like a lover.

MR. STEWART: How was that?

[KEITH]: 
The sex.

MR. STEWART: But I told you I didn't want that.

[KEITH]: 
Why?

MR. STEWART: Because of the age difference.  I can go to jail for the rest of my life, Keith.

[KEITH]: 
Then why did you do it?

MR. STEWART: I don't know.  I thought that's what you wanted.  I mean, you're asking me to buy the blow-up doll, you're asking me to get you pornos, I catch you looking at pornos on the computer.  You didn't say no.

* * *

[KEITH]: 
If you *** love me and you could go to jail, then why did you do it, do those things?

MR. STEWART: I thought that's what you wanted.  I wanted to make you happy, Keith, I just wanted *** you to be friends with me and I was gonna do whatever it took to keep you as a friend.

[KEITH]: 
But I never asked for it.

MR. STEWART: No, you didn't, but you never said no either.  Except that one time and I said okay.  If you would have said no the very first time, then it would have ended right there. ***

* * *

[KEITH]: 
Do I tell my mom about the sex stuff?

MR. STEWART: I'm telling you Keith, if you tell your mom about that I will be in jail for the rest of my life."

Sergeant Dave Kundrot of the Lombard police department testified that on October 12, 2000, he and other officers executed warrants to arrest defendant and to search his apartment.  Kundrot identified several photographs of defendant's apartment that were taken at the time the search warrant was executed.

The jury found defendant guilty of aggravated criminal sexual abuse and criminal sexual assault.  The trial court sentenced defendant to consecutive terms of 7 and 10 years' imprisonment and credited defendant for 72 days already served.  The trial court denied defendant's motion for a new trial and motion to reconsider the sentence, and defendant timely appealed.

III. DISCUSSION

A. Motion to Suppress Recorded Telephone Conversations

Defendant argues first that the trial court erred in denying his pretrial motion to suppress the recorded telephone conversations.  According to defendant, the recordings should have been suppressed because the order authorizing the eavesdrop erroneously named Maria Reyes as the consenting party.  Holguin's application for an order authorizing the use of an eavesdropping device and the trial court's order granting the application are not a part of the record.  Defendant has appended these documents to his brief.  Generally, attachments to briefs that are not otherwise a part of the record are not properly before a reviewing court and cannot be used to supplement the record on appeal.  
In re O.R.
, 328 Ill. App. 3d 955, 961 (2002).  A reviewing court may consider an attachment, however, if the parties stipulate that it is authentic.  
Office Electronics, Inc. v. Adell
, 228 Ill. App, 3d 814, 819 (1992).  Here, the State represents that it does not object to our consideration of the documents, and it is apparent that the trial court considered the documents during the hearing on the motion to suppress.  Therefore, we will consider them.

Holguin's application was signed by the State's Attorney and detailed the reasons why Holguin suspected that defendant committed acts of sexual abuse against Keith.  The application stated that Keith was the consenting party and it requested permission to overhear telephone conversations between Keith and defendant.  On October 5, 2000, Judge Kathryn E. Creswell granted the application.  In reciting the court's findings, the order authorizing the eavesdrop stated,  "Keith D[.] has consented to the use of an eavesdropping device and will participate in the conversations(s).  *** There is reasonable cause for believing that William V. Stewart the other party participating in said conversation(s) are [
sic
] committing, have committed, or are about to commit Aggravated Criminal Sexual Abuse ***."  The decree line stated, however,  "[t]hat authorization to use an eavesdropping device is hereby granted *** for the purpose of overhearing and/or recording a conversation or conversations which shall occur between 4:30 PM, October 5
th
, and 4:30 PM, October 15
th
, 2000 between 
Maria Reyes
, a consenting person, William V. Stewart and others yet unknown ***."  (Emphasis added.)

Where any one party to a conversation yet to occur has consented to the use of an eavesdropping device to overhear or record the conversation, a judge may grant an application to use an eavesdropping device.  725 ILCS 5/108A--3(a) (West 2000).  The application must include (1) the identity of the law enforcement officer making the application and the State's Attorney authorizing it; (2) a statement of the circumstances justifying the officer's belief than an eavesdrop order should be issued, including (a) details about the felony being investigated, (b) a description of the type of communication sought to be monitored, (c) the identity of the consenting party, and (d) the identity of the other party whose conversations are to be overheard; and (3) the period during which the eavesdropping device will be used.  725 ILCS 5/108A--3(a) (West 2000).  The order granting the application must specify (1) the identity of the consenting person and a requirement that any conversation overheard must include this person; (2) the identity of other parties who will participate in the conversation; and (3) the period during which the use of the device is authorized.  725 ILCS 5/108A--5(a) (West 2000).

Any aggrieved person may move to suppress the contents of a recorded conversation on the grounds that (1) the conversation was unlawfully overheard and recorded; (2) the order authorizing the use of an eavesdropping device was improperly granted; or (3) the recording was not made in conformity with the authorization order.  725 ILCS 5/108A--9(a) (West 2000).  Generally, when a trial court's ruling on a motion to suppress evidence turns on questions of fact, we will not disturb the ruling unless it is manifestly erroneous.  
People v. Bockman
, 328 Ill. App. 3d 384, 388 (2002).
  
Where, as here, there are no disputed facts on appeal, the issue becomes one of law subject to a 
de novo
 review.  
People v. Gonzalez
, 313 Ill. App. 3d 607, 612 (2000).
  

The purposes of the eavesdropping statute are to ensure that all eavesdropping is subject to judicial supervision and to prevent unwarranted intrusions into a person's privacy.  
People v. Nunez
, 325 Ill. App. 3d 35, 45 (2001).  Although the requirements of the statute must be strictly construed, not all statutory violations require suppression.  
People v. Roake
, 334 Ill. App. 3d 504, 513-14 (2002).  Where the purpose and reasoning behind requiring judicial authorization were satisfied and the State gained no tactical advantage, any technical defect in the State's compliance with the statutory requirements does not require suppression.  
People v. Manuel
, 294 Ill. App. 3d 113, 123 (1997).

Here, defendant relies merely on a technical defect in the authorization order.  The application and the findings recited in the order identified Keith as the consenting party and defendant as the other party to the conversations to be overheard.  The naming of Maria Reyes in the decree line clearly was a scrivener's error.  The core requirements of the statute were complied with, the purpose of the statute was satisfied, and the State gained no tactical advantage as a result of the technical defect.  See 
Gonzalez
, 313 Ill. App. 3d at 613 (suppression not required where State identified the consenting party by an alias
); 
Manuel
, 294 Ill. App. 3d at 122-23 (same).  Therefore, the trial court did not err in refusing to suppress the recordings of the telephone conversations.

B. Venire Taint

Defendant argues second that the venire became tainted when (1) the trial court recited the allegations of counts of the indictment that the State nol-prossed before the trial and (2) the prospective jurors heard other prospective jurors' reactions to the nature of the charges.  The purpose of 
voir dire
 is to insure the selection of an impartial panel of jurors free from bias or prejudice.  
People v. Tenney
, 329 Ill. App. 3d 430, 439 (2002).  Impartiality is not a technical concept, however, and, the trial court is in a superior position to gauge the meanings of the responses to the questions posed to the prospective jurors.  
People v. Aleman
, 313 Ill. App. 3d 51, 59 (2000)
.  Accordingly, its determination as to the impartiality of the jurors is entitled to deference and will not be set aside unless it is against the manifest weight of the evidence.  
People v. Hunter
, 331 Ill. App. 3d 1017, 1028 (2002).  Also, the trial court retains broad discretion in conducting 
voir dire
.  
People v. Hope
, 168 Ill. 2d 1, 30 (1995).  The standard for evaluating a court's exercise of discretion during 
voir dire
 is whether the questions posed and procedures employed created a reasonable assurance that prejudice would be discovered if present.  
Tenney
, 329 Ill. App. 3d at 439.

Defendant argues that when the trial court read counts XII, XIII, and XIV to the venire, "an unsubstantiated assertion was put before the jury at the outset of selection, which obviously presented an unsettling, disturbing and disgusting image to the potential jurors, and served to taint the subsequent selection process."  We disagree.  Under the circumstances, the reading of these counts did not deny defendant a fair trial.  We note that defendant never asked the trial court to discharge the jury, and we cannot say that the trial court abused its discretion by not doing so.  The charges that the State dismissed were not materially different from the remaining charges, and therefore, it is highly unlikely that the reading of the dismissed counts prejudiced defendant in any way.  Furthermore, the allegations merely set forth the general acts constituting the alleged offenses.  Beyond the basic acts themselves, the indictment contained no graphic or inflammatory details about the alleged offenses.  See 
People v. Sims
, 192 Ill. 2d 592, 623 (2000).

To the extent that reading the charges that ultimately were dismissed was problematic, the trial court cured any potential prejudice.  The court instructed the venire that the indictment was not evidence against defendant and instructed the jury not to consider the dismissed charges.  See 
People v. Washington
, 127 Ill. App. 3d 365, 381 (1984) (defendant was not prejudiced where, after charge read to jury was nol-prossed, no further mention was made of it).
  Therefore, this cause is unlike 
People v. Paull
, 176 Ill. App. 3d 960, 962-63 (1988), where the jury was not informed that the State had elected not to prosecute a count of the original indictment mistakenly read to it.

Likewise, the comments some prospective jurors made in open court did not deny defendant a fair trial.  The questioning by the trial court and the parties adequately addressed each prospective juror's ability to be impartial and decide the case on the evidence.  
Hunter
, 331 Ill. App. 3d at 1029.  After defense counsel expressed concern about the prospective jurors' comments, the trial court conducted a sequestered 
voir dire
 of any prospective jurors who indicated that there was something about the nature of the charges that would affect their impartiality.  There is no indication that any of the jurors was unable to be impartial, "and the general tenor of questioning in 
voir dire
 as well as the trial court's comments and instructions throughout the course of jury selection and the trial served to cure any error there might have been."  
Hunter
, 331 Ill. App. 3d at 1029.  "[W]e decline to presume that mere exposure to another's bias tainted the venire, each member of which expressly denied any such similar bias.  Rather, we assume that the jurors were reasonable, conscientious, and impartial ***."  
People v. Cloutier
, 156 Ill. 2d 483, 497 (1993).  Defendant's challenges to the jury selection process here are without merit.

C. Admission of Photographs

Defendant argues third that the trial court erred in admitting three photographs.  The first was a school photo of Keith.  Kimberly testified that the photo depicted Keith when he was 13 years old and in seventh
 grade.  Most of the events recounted during the trial occurred during the 1999-2000 school year, when Keith was in 
eighth grade.  During cross-examination, Kimberly acknowledged the existence of an eighth-grade photo of Keith.  Defendant argues that, by introducing a photo in which Keith was much younger than he was at the time of the offenses, the State sought to inflame the jury's passions.  The second and third photographs were taken during the execution of the warrant to search defendant's apartment.  One photo is of defendant's closet.  An object that appears to be a toy can be seen sitting on the shelf.  The other photo is a close-up of the object, which is a box that purports to contain a "101 Dalmations" snow globe.  Defendant argues that these photos were unduly prejudicial because they tended to create an inference of "pedophilic perversity."

The decision whether to admit a photograph into evidence is committed to the trial court's discretion.  
People v. Mercado
, 333 Ill. App. 3d 994,1000-01 (2002).  The trial court's decision must be based on a consideration of the photograph's probative value weighed against its prejudicial effect, whether the photograph portrays facts relevant to an issue, and whether it can be verified as a correct representation of those facts.  
People v. Sykes
, 341 Ill. App. 3d 950, 980 (2003).  We will reverse the trial court's decision only if the court abused its discretion and defendant was prejudiced as a result.  
Sykes
, 341 Ill. App. 3d at 980.

The State argues that defendant has waived his challenge to the introduction of Keith's photo.  During a conference just before the trial began, defense counsel stated that he had no objection to the introduction of the photo.  When the State rested and sought to introduce the photograph, defense counsel did not object.  Counsel did raise the issue in defendant's posttrial motion, however.  To preserve an error for review, a defendant must both object to the alleged error during the trial and renew the objection in his written posttrial motion.  
People v. Flynn
, 341 Ill. App. 3d 813, 828 (2003).  The waiver rule serves an important purpose because a timely objection will allow the trial court to correct any errors.  
People v. Sergeant
, 326 Ill. App. 3d 974, 981 (2001).  A party who fails  to object cannot obtain the advantage of a reversal by failing to act.  
Sergeant
, 326 Ill. App. 3d at 981.  Accordingly, we consider the issue waived and will decide only whether admitting the photo constituted plain error.  The plain error exception to the waiver rule may be invoked where (1) the evidence is closely balanced or (2) the error is of such magnitude that there is a substantial risk that the defendant was denied a fair trial, and remedying the error is necessary to preserve the integrity of the judicial process.  
People v. Smith
, 341 Ill. App. 3d 729, 737 (2003).

Instead of being closely balanced, the evidence here strongly supports the verdict.  Keith offered direct and credible testimony of defendant's guilt, and the taped telephone conversations corroborated that testimony.  Moreover, under the circumstances, the admission of Keith's photo did not deprive defendant of a fair trial.  According to Kimberly's testimony, defendant and Keith became friends during the summer of 1999, less than one year after the photo was taken.  There is no indication that Keith's appearance changed dramatically between the beginning of seventh grade and the beginning of eighth grade.
  The jury heard when the photograph was taken and therefore was able to consider that the photo was somewhat dated.

Also, we conclude that the trial court did not abuse its discretion by admitting the photographs of the toy package.  We agree with the State that the photographs were relevant because the toy reasonably could be viewed as a part of a pattern of conduct designed to make Keith feel more comfortable in defendant's home.  The trial court excluded several other photographs of toys and children's films, thereby minimizing any prejudice to defendant.  The trial court reasonably could have concluded that the probative value of the photographs outweighed any prejudicial effect they might have had.  Moreover, we cannot say that the photos prejudiced defendant.  As we stated earlier, the evidence was not closely balanced, and it is unlikely that the photos tipped the balance in favor of a guilty verdict.

D. Cumulative Error

Defendant argues that, even if, standing alone, each alleged error discussed above does not warrant reversing and remanding for a new trial, the cumulative effect of these errors does rise to reversible error.  Generally, there is no cumulative error where none of the alleged errors amounts to reversible error.  
People v. Wood
, 341 Ill. App. 3d 599, 615 (2003).  Because we have rejected defendant's claims of trial error and concluded that none of the challenged rulings prejudiced defendant, the cumulative error doctrine does not apply here.  
People v. Bradley
, 220 Ill. App. 3d 890, 904-05 (1991).

E. Sentencing Credits

Finally, defendant argues that he is entitled to an additional day of credit against his sentence and a $365 credit against his fines.
  The State responds that the record is not sufficient to determine whether defendant received the proper sentencing credits.

The trial court credited defendant for 72 days served before sentencing.  Defendant is entitled to credit for each day or part of a day he spent in custody before sentencing.  730 ILCS 5/5--8--7 (West 2000); 
People v. Bussan
, 306 Ill. App. 3d 836, 840 (1999).  The record reveals that defendant was arrested on October 12, 2000, and posted bond on October 13, 2000.  The trial court revoked defendant's bond when he was found guilty on June 13, 2002, and sentenced defendant on August 22, 2002.  We count 73 days that defendant spent in custody before sentencing.  Accordingly, defendant is entitled to credit for an additional day.

For each of the two offenses of which defendant was convicted, the trial court imposed a $100 sexual assault fine (730 ILCS 5/5--9--1.7 (West 2000)).  Also, the trial court ordered defendant to pay a criminal surcharge and to pay into the Court Sentence Monitoring Program, Driver's Education Fund, and Violent Crime Victims Assistance Fund.  Defendant seeks credit against all of these assessments.

Under section 110--14 of the Code of Criminal Procedure of 1963, for each day or part of a day spent in custody before sentencing, 
a defendant is entitled to a credit of $5 against fines imposed as a result of the conviction.  725 ILCS 5/110--14 (West 2000); 
People v. Gathing
, 334 Ill. App. 3d 617, 619 (2002); 
People v. Stahr
, 255 Ill. App. 3d 624, 627 (1994).  The credit is limited to "fines" and does not apply to anything else such as costs or fees.  
People v. White
, 333 Ill. App. 3d 777, 781 (2002).

Section 110--14 applies to the sexual assault fines.  
People v. Hawkins
, 311 Ill. App. 3d 418, 432 (2000).  The statutes authorizing the criminal surcharge and the payments into the Driver's Education Fund and the Violent Crime Victims Assistance Fund expressly disallow the section 110--14 credit.  625 ILCS 5/16--104a (West 2000) (Driver's Education Fund); 725 ILCS 240/10(c) (West 2000) (Violent Crime Victims Assistance Fund
); 730 ILCS 5/5--9--1(c) (West 2000) (criminal surcharge).  A reading of the statutes providing the authority for the sentence monitoring program  reveals that the assessment is a fee to defray the cost of operating the program and not a fine subject to the section 110--14 credit.  730 ILCS 5/5--6--3(g), 5--6--3.1(g) (West 2000); 
White
, 333 Ill. App. 3d at 782.  Therefore, defendant is entitled to a credit against only the sexual assault fines.  The credit eliminates the $200 in fines, but defendant is not entitled to any  credit against the additional monetary obligations imposed here.

IV. CONCLUSION

We modify the sentencing order to reflect 73 days' credit against defendant's sentence and a $200 credit against defendant's fines and in all other respects affirm the judgment of the circuit court of Du Page County.

Affirmed as modified.

KAPALA and GILLERAN JOHNSON, JJ., concur.