No. 2--07--0470     Filed: 12-10-08

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 05--CF--2747 |
| CHARLES De FILIPPO, | ) ) ) | Honorable James K. Booras, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BOWMAN delivered the opinion of the court:

Following a jury trial, defendant, Charles De Filippo, was convicted of two counts of forgery (720 ILCS 5/17--3(a)(1) (West 1998); 720 ILCS 5/17--3(a)(1) (West 2002)) and sentenced to two years' probation. On appeal, defendant argues that: (1) he was not proven guilty of forgery beyond a reasonable doubt; (2) the trial court improperly instructed the deadlocked jury to continue to deliberate, instead of declaring a mistrial; and (3) one of his convictions must be vacated because he is alleged to have committed only one act of forgery. We reverse.

I. BACKGROUND

A. Indictment

Defendant and a codefendant, Lawrence Lesza, were indicted on July 27, 2005, for fraudulently attempting to secure additional pension credit for defendant under the Sheriff's Law Enforcement Program (SLEP). The State generally alleged that, although defendant became eligible

for SLEP in September 1984, he submitted documents falsely stating that he became eligible in November 1981, in order to secure benefits to which he was not entitled.

The indictment contained seven counts. Count I charged defendant and Lesza with conspiracy (720 ILCS 5/8--2 (West 2002)) to commit theft of over $100,000 (720 ILCS 5/16--1(a) (West 2002)) and/or forgery (720 ILCS 5/17--3(a)(1) (West 2002)). The theft consisted of submitting documents, including a letter delivered in August 2003, in which they knowingly falsely stated that defendant became a sworn deputy of the Lake County sheriff's office in November 1981. The forgery similarly consisted of preparing the letter delivered in August 2003.

Count II charged defendant and Lesza with attempted theft of property worth more than $100,000 (720 ILCS 5/8--4(a) (West 2002)) for sending a letter dated August 12, 2003, that falsely stated that defendant became a sworn deputy in November 1981.

Count III charged defendant and Lesza with forgery (720 ILCS 5/17--3(a)(1) (West 1998)) for making a document on or about August 26, 1999, in which they knowingly falsely stated that defendant was sworn as a deputy in November 1981.

Count IV charged defendant with forgery (720 ILCS 5/17--3(a)(1) (West 1998)) for writing a letter on or about March 29, 1999, addressed to Sheriff Gary Del Re, in which, with the intent to defraud, defendant falsely stated that: (1) on November 16, 1981, he was deputized at the Lake County clerk's office; (2) during May 1982, Lesza, the director of corrections, requested his deputy badge and explained that his employment status had been reclassified as a correctional officer; and (3) he worked for the "Warrants Division, Correctional Division and Special Details for the Department" between November 16, 1981, and May 1982.

Count V charged defendant with forgery (720 ILCS 5/17--3(a)(1) (West 2002)) for, on or about August 12, 2003, submitting a copy of the March 29, 1999, letter.

Count VI charged defendant with forgery (720 ILCS 5/17--3(a)(1) (West 2002)) for, on or about August 12, 2003, altering a copy of the March 29, 1999, letter by deleting two sentences.

Count VII charged defendant with forgery (720 ILCS 5/17--3(a)(1) (West 2000)) for, on or about February 15, 2000, knowingly falsely stating in a letter to Jerry Nordstrom, an Illinois Municipal Retirement Fund (IMRF) representative, that he was deputized on November 16, 1981.

### B. Trial

Defendant and Lesza were jointly tried in a jury trial lasting nine days. We summarize the relevant testimony below. Del Re testified as follows. He was the Lake County sheriff from October 1996 to November 2006. Lesza was the director of the jail and defendant was the deputy director of the jail. Defendant had indicated to Del Re that he believed that he had earned additional service credits under SLEP.

Defendant gave Del Re a letter dated March 29, 1999.[1] The letter was addressed to Del Re and stated:

"As we discussed, I am requesting that you intervene for me to obtain thirty two (32) months of Sheriff's Law-Enforcement Retirement service toward my retirement account. The following information is an outline of the service in question and the contacts which I have coordinated.

• Saturday, November 14, 1981, I started my employment with the Lake County Sheriff's Department. The following Monday, November 16, 1981, the Director of

---

[1]This letter is relevant to counts IV, V, and VI.

Corrections, Lawrence Lesza, as ordered by then Sheriff Thomas Brown, instructed me to fill out the provided documentation to be deputized. Consequently, on November 16, 1981, I was deputized at the Lake County Clerk's Office.

• Because I was not a Correctional Officer who originally had the Deputy's status revoked, I remained deputized for the duration of my employment. During May 1982, the Director of Corrections, Lawrence Lesza, requested my deputy badge and explained that they had reclassified my employment status with the Lake County Sheriff's Office as a Correctional Officer. Note: Between November 16, 1981 and May 1982, I worked for the Warrants Division, Correctional Division, and special details for the Department.

• On September 14, 1984, I was again sworn as deputy under the direction of then Sheriff Robert Babcox. My responsibilities were External Transportation, mental health community arrests, serving warrants and special details.

Consequently, a lawsuit was filed against the County of Lake involving the deputy's status of approximately a dozen employees. At that time I did not allow myself to be named as a litigant of the lawsuit. After the ruling in favor of the employees, they automatically adjoined each person falling under this special deputy's status as a litigant. The ruling specifically related to the Sheriff's Law Enforcement Retirement Fund and an Appellate Court order to place each deputy under the fund.[2]

---

[2] In Roche v. County of Lake, 205 Ill. App. 3d 102, 115 (1990), this court held that SLEP applies to "any person sworn by the sheriff as a deputy and paid full time to act at the direction of the sheriff," even if the employee did not "participate in law enforcement duties on a daily basis." We further held that the plaintiffs were "entitled to participate in the sheriff's pension plan from the time

As it became necessary to identify each employee and the date that they became deputized, then Sheriff Clinton Grinnell submitted a letter for each employee that identified the date to start the S.L.E.P. Retirement. In my case, they identified the S.L.E.P. start date as September 14, 1984. Until recently, I was under the impression that my S.L.E.P. date had started on November 16, 1981. Because of this, thirty-two months do not fall under S.L.E.P. and only apply toward I.M.R.F.

After researching the scenario, it would appear that not only could the Lake County Clerk's Office personnel not find my deputy papers from 1981, but they failed to find the papers from 1984, as well. It would also appear that Sheriff Grinnell retrieved a blank form and filled it out for the 1984 date and sent it to S.L.E.P.

After contacting S.L.E.P. personnel and discussing the error with them, they advised me that they would need paper work from the County Sheriff stating that the time reflected is not correct. Also, I spoke with Mr. Daniel Field[] (County attorney defending the case for the County of Lake), and he advised that the Sheriff could correct the date with a letter.

It is important to emphasize, <u>during my early months of employment with the Lake County Sheriff's Department, they temporarily assigned me to the Warrants Division, and Civil Process.</u> Therefore, my duties were that of a Deputy Sheriff.

I spoke with several other litigants that received S.L.E.P. based on the mentioned lawsuit trying to identify any other person this decision would effect [sic]. Clearly, no other person could allege to have been deputized before the time they received the S.L.E.P.

they were employed full-time by the sheriff's office and sworn as deputies." <u>Roche</u>, 205 Ill. App. 3d at 115.

-5-

benefits. Therefore, my request is isolated and would not encompass researching other cases. During the onset of this concern I decided not to breach the subject in writing based on Sheriff Grinnell's lack of interest, and was coordinating with I.M.R.F. in an effort to determine the proper retirement date based on the September 14, 1984 date. However, after further research it became appearent [sic] the serious impact this date has on my retirement ability and pension security under S.L.E.P. verses [sic] I.M.R.F.

Obviously, this request would need to be supported by you and the County of Lake. Then a letter would need to be sent to I.M.R.F. outlining the actual date that S.L.E.P should have taken affect [sic]. It is extremely important that this request be taken into consideration by both you and the County of Lake. The reflection of the actual time I have spent as a deputy impedes my ability to lock in twenty years of service on November 16, 2001. Though I do not plan to retire from the department then, the additional months of service will have a serious impact on the financial aspect of my retirement. Lastly, to lock in my retirement on the correct date will ease the apprehension that most feel in a politically appointed position.

I sincerely appreciate your efforts involving this matter and am available to answer any questions you may have." (Emphases added.)

The letter was copied to "Undersheriff Gary Stryker," "Director of Corrections, Lawrence Lesza," and "File."

Del Re initially did not take any action. He later received from Lesza a notarized letter dated August 26, 1999.[3] It stated:

---

[3] This letter is the subject of count III.

"On November 14, 1981, Charles M. De Filippo became an employee by the Lake County Sheriff's Department. On the following Monday, November 15, 1981, or November 16, 1981, under the direction of Sheriff Thomas Brown, I personally escorted Charles M. De Filippo to the Lake County Clerks Office. It was on this date that Charles M. De Filippo was sworn in as a Lake County Sheriff's Deputy.

My position with the Lake County Sheriff's Department was that of the Jail Superintendent on the date that I witnessed Charles M. De Filippo[] take his oath of office as a Deputy Sheriff with the Lake County Sheriff's Office.

I swear under oath that the above statement is true and correct and that I was acting officially as the Lake County Jail Superintendent, and under the direction of Sheriff Thomas Brown."

Based on the letters from defendant and Lesza, Del Re wrote a letter in support of defendant, dated September 7, 1999, to the director of human resources. Del Re wrote another letter on defendant's behalf on February 8, 2000. It was addressed to Jerry Nordstrom, manager of employee benefits. Del Re noted that IMRF was requesting a certified copy of the 1981 indemnity bond sheet that would have been issued when defendant became a deputy. Del Re stated that Willard Helander, the Lake County clerk, had informed his office that records of indemnity bond sheets from the early 1980s were routinely destroyed, pursuant to statute, which made it impossible to produce original records. Del Re stated that he and defendant had provided IMRF with all of the information necessary to support their position.

After Lesza retired from the sheriff's department, Del Re promoted defendant to director of the jail. Sometime in 2000, IMRF granted defendant the additional 32 months of SLEP credit. In

July 2003, Del Re asked defendant to resign from the department for reasons unrelated to SLEP. Within one month of defendant's resignation, a former correctional officer who had been fired made a complaint that defendant had illegally obtained SLEP credit. Del Re asked defendant to "provide any additional information or summarize the conditions in which he claimed to have worked in a sworn capacity, so [Del Re] could further review any additional facts that might be pertinent once that information was revealed." Del Re received a letter via fax from defendant on August 12, 2003.[4] The letter appeared to be a copy of the March 29, 1999, letter.

Del Re did not compare the two letters at the time, but he did compare them in preparation for trial. The faxed copy had omitted the following sentences:

"During the onset of this concern I decided not to breach the subject in writing based on Sheriff Grinnell's lack of interest, and was coordinating with I.M.R.F. in an effort to determine the proper retirement date based on the September 14, 1984 date. However, after further research it became appearent [sic] the serious impact this date has on my retirement ability and pension security under S.L.E.P. verses [sic] I.M.R.F."

Del Re had copies of the original letter in various files. The omission in the fax did not cause Del Re to feel that "anything was being put over on" him. The fact of the omission was "unusual," but Del Re was "not sure that it meant a great deal" and was "not sure what to make of that."

Several correctional officers testified that they were assigned to a newly created jail transport unit in summer 1984, along with defendant. Before the formation of the unit, the warrants division generally transported inmates outside of the facility. The transport unit members were sworn in as deputies on September 11, 1984. One correctional officer, Raul Aragon, testified that, in January

---

[4] The letter faxed on August 12, 2003, forms the basis of counts I, II, V, and VI.

1982, he was sworn in as a deputy sheriff because he signed up to work on the boat patrol unit one night a week. The rest of the time, he was still working as a jailer. Aragon worked on the boat patrol unit only from spring to fall 1982. He wore a five-pointed deputy star while on boat patrol and a six-pointed star at the jail.

Various individuals who had worked in warrants and civil process between 1981 and 1983 testified that defendant never worked in or was assigned to those divisions during those years. However, there was also testimony that, if the warrants division was closed and a prisoner was delivered to the jail, a correctional officer would serve the warrant by pulling it and physically giving a copy to the prisoner.

Thomas Brown testified as follows. He was the Lake County sheriff from 1978 to 1982, for one term. He appointed Lesza as superintendent of the jail. When Brown first took office, everyone who had deputy status had to be resworn as part of the standard procedure upon the election of a new sheriff.

Brown had the power to appoint deputies and to revoke their deputy status. On December 31, 1980, he wrote a letter reflecting that he had decommissioned people working in the jail as deputy sheriffs and reclassified them as jail officers. The deputy status had given them the authority to make arrests, and Brown did not think that they had the training or qualifications for that authority. Included on the list of people whose deputy status was revoked was Lesza. In 1981, therefore, jailers were not being deputized.

A personnel action form showed that defendant was hired as a jail officer on November 14, 1981. Brown did not know defendant personally and did not recognize him. Brown never issued an order to have defendant deputized in 1981. He would not have deputized defendant, because he had

already decommissioned jail officers, and deputizing just defendant would have caused turmoil. Brown agreed that, if there were a jailer who worked in boat patrol, he would have been deputized. When he came back to the jail, he would serve as a correctional officer.

Jerry Nordstrom testified that he was the benefits manager for the Lake County human resources office from March 1998 until December 2002. Nordstrom was the designated IMRF representative for Lake County, and he became involved with defendant's request for more time under SLEP. In drafting a letter endorsing defendant's request, Nordstrom relied on defendant's letter, Lesza's statement, and Del Re's September 7, 1999, letter. Nordstrom had the authority to recommend accepting or rejecting defendant's request, though IMRF made the ultimate decision.

Louis Kosiba, the Executive Director of IMRF, provided the following testimony. The IMRF plan covers all Lake County employees, while the SLEP program covers only sheriffs and sheriff's deputies. In 1990, an appellate court decision required IMRF to do some recalculations for certain employees who were deemed entitled to additional SLEP credit, based on when they were first deputized.[5] Those who chose to accept the additional credit were required to make payments reflecting the difference withheld from salaries under IMRF versus SLEP.

For defendant, the county provided IMRF with a bond executed on September 11, 1984, for his deputization. Kosiba testified regarding an IMRF letter written to defendant dated March 15, 1991. The letter stated that Lake County had informed IMRF that defendant was sworn in and eligible for SLEP coverage as of September 11, 1984. It stated that, if defendant believed that the date was incorrect, he should contact IMRF. It also included a past-service payment schedule.

---

[5] See Roche, 205 Ill. App. 3d 102.

-10-

IMRF received a first remittance payment from defendant on June 24, 1991. He made some additional payments after that. Kosiba found nothing in defendant's file to indicate that before 1999 he had contested the SLEP start of September 11, 1984. The first time IMRF was notified that defendant was contesting the date was when it received a packet of documents from Nordstrom in September 1999, regarding defendant's request for SLEP credit going back to November 14, 1981.

In a February 15, 2000, letter to Nordstrom,[6] defendant wrote:

"In response to the questions posed by I.M.R.F. as outlined in your questions, please note the following.

During 1991, after the court ruling placing the litigants under the S.L.E.P. retirement fund, I received an unsigned and uncertified oath to sign. At that time I spoke with then Sheriff Clinton Grinnell and explained that I was deputized in 1981. Sheriff Grinnell explained that until I paid back all monies for past credits I would not receive the 32 months of credit. It was during 1991 I started to make the identified payments for back credits. I was under the impression that until all back payments were made the record would not reflect all months of credit. Secondly, between 1991 and the time that Sheriff Grinnell left office, on at least three occasions I spoke with him about the error and asked if he had a chance to investigate it. As I explained to Sheriff Del Re, there came a point whereas I felt that my concerns were getting ignored. Initially I was not extremely concerned with the 1984 date because I had no intentions of retiring until the age of 50. However, I have since researched and determined the impact that the 32 months would have on my overall retirement and my ability to secure my required vestage [sic] on November 16, 1981. This is the reason that I

---

[6] This letter is the basis of count VII.

am now aggressively seeking the I.M.R.F. credits to be rightfully converted to S.L.E.P. credits.

***

Clearly, I was deputized on November 16, 1981, and I am entitled to have the 32 months of I.M.R.F. credit converted to S.L.E.P. credits. I understand and appreciate the concern of our I.M.R.F. representatives. However, I am equally concerned that our failure to resolve this issue will affect my ability to secure my retirement under the current Sheriff's administrative team."

The letter was copied to Del Re, Gary Stryker, Daniel Field, and "File."

In February 2000, based on the letters from defendant, Del Re, and Lesza, along with Nordstrom's recommendation, Kosiba decided that, even though there was missing information, the weight of the documentation favored granting defendant's request. Lake County would have had to pay $634,675.07 to fully fund defendant's SLEP retirement benefits versus $290,650.40 to fund his benefits under IMRF, a difference of $344,024.67. Defendant never actually began receiving benefits under either plan, because he had not yet reached the age of eligibility.

Lesza testified as follows. Defendant began working as a jail officer on November 14, 1981. Lesza had a meeting with Brown the week before defendant was hired. Brown was under criticism for response times in the district, because officers would have to go to various other municipalities' holding facilities to pick up detainees held on Lake County warrants and take them to the jail before returning to the district. Anytime that an officer had to leave the district, he would not be available to handle routine calls and respond to traffic situations. Lesza explained to Brown that he could "resolve the issue" by designating a correctional officer on the second shift to be available as needed

to pick up detainees. That position would require deputization. The problem occurred primarily during the second shift because, during the day, the warrants division was able to pick up the detainees.

The shift commander, who was deceased at the time of trial, did not want to designate a seasoned jail officer for the responsibility of picking up detainees, because she was short-staffed. She preferred that defendant take the position for that reason and because he had experience driving large vehicles. Lesza discussed the shift commander's position with Brown. In November 1981, Brown was preoccupied with his election, and he pretty much gave Lesza a free hand in running the jail.

On November 16, 1981, Lesza escorted defendant to the clerk's office to be sworn in as a deputy sheriff. Lesza had agreed with Brown that defendant should wear his corrections badge on the outside of his shirt and keep the deputy badge in his wallet, to reduce any friction that could occur with other jailers. Defendant worked in the special transport position for three to six months, until Sheriff Brown decided to revoke his deputy status. Lesza did not know who filled the special transport role afterwards.

Richard Eckenstahler, the sheriff's department chief of operations, testified that, although the Department had "radio cards," which are made each time a police officer or deputy is put on assignment, dating back to the 1960s, Eckenstahler could not find any records that defendant transported any prisoners between November 16, 1981, and May 31, 1982. Eckenstahler further testified that he was with the highway patrol from 1979 until 1986 and was not aware of any serious problems with prisoners sitting in local municipalities for extended periods of time.

C. Jury Verdict and Posttrial Proceedings

The jury found defendant not guilty of counts I (conspiracy to commit theft or forgery), II (attempted theft with respect to the August 12, 2003, faxed letter), III (forgery with respect to Lesza's August 26, 1999, letter), and VII (forgery with respect to defendant's February 15, 2000, letter to Nordstrom). It found defendant guilty of counts IV (forgery with respect to the March 29, 1999, letter), V (forgery with respect to the August 12, 2003, faxed letter), and VI (forgery with respect to the August 12, 2003, faxed letter containing different provisions). The jury found Lesza not guilty of all charges.

The trial court denied defendant's motion for a judgment of not guilty notwithstanding the verdict or for a new trial. The trial court entered judgment on counts IV and V, finding that counts V and VI merged under the one-act, one-crime rule. See People v. King, 66 Ill. 2d 551 (1977). It sentenced defendant to 24 months' probation, 12 months' periodic imprisonment, and 200 hours of community service. The periodic imprisonment was stayed pending performance on probation, and the community service hours were stayed until defendant was medically able to perform them. Defendant timely appealed.

## II. ANALYSIS

Defendant first argues that he was not proven guilty of forgery beyond a reasonable doubt. The standard of review for a claim of insufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); People v. Collins, 106 Ill. 2d 237, 261 (1985). The trier of fact has the responsibility to assess witnesses' credibility, weigh their testimony, resolve inconsistencies and conflicts in the evidence, and draw reasonable inferences from the evidence.

People v. Sutherland, 223 Ill. 2d 187, 242 (2006). We will reverse the trier of fact's decision only if the evidence is so unsatisfactory, improbable, or implausible that it leaves a reasonable doubt regarding the defendant's guilt. People v. Slim, 127 Ill. 2d 302, 307 (1989).

Section 17--3 of the Criminal Code of 1961 (720 ILCS 5/17--3(a) (West 2002)) states:

"(a) A person commits forgery when, with intent to defraud, he knowingly:

(1) makes or alters any document apparently capable of defrauding another in such a manner that it purports to have been made by another or at another time, or with different provisions, or by authority of one who did not give such authority: ***

* * *

(b) An intent to defraud means an intention to cause another to assume, create, transfer, alter or terminate any right, obligation or power with reference to any person or property. As used in this Section, 'document' includes, but is not limited to, any document, representation, or image produced manually, electronically, or by computer.

(c) A document apparently capable of defrauding another includes, but is not limited to, one by which any right, obligation or power with reference to any person or property may be created, transferred, altered or terminated." 720 ILCS 5/17--3 (West 2002).[7]

The State argues that defendant's challenge to the sufficiency of the evidence must be analyzed in the context of the jury instructions. The jury was instructed that "[a] person commits the offense of Forgery when he, with intent to defraud, knowingly makes a document apparently capable of

_____

[7] The quoted portions of section 17--3 are identical to the 1998 version of the statute, which applies to count IV, except that the 1998 version does not contain the second sentence in subsection (b). 720 ILCS 5/17--3 (West 1998).

defrauding another <u>which made it appear that an event had occurred that did not occur</u>." (Emphasis added.) For most of the counts of forgery, the jury was also instructed:

"To sustain the charge of Forgery ***, the State must prove the following propositions:

First Proposition: That the defendant knowingly made a document <u>so that it appeared that an event occurred which did not occur</u>; and

Second Proposition: That the defendant did so with the intent to defraud; and

Third Proposition: That document was apparently capable of defrauding."[8] (Emphasis added.)

The first jury instruction differs from the Illinois Pattern Jury Instructions in that it uses the language, "which made it appear that an event had occurred that did not occur," rather than, "so that it appears to have been made [(by another) (at another time) (with different provisions) (by authority of one who did not give such authority)]." Illinois Pattern Jury Instructions, Criminal, No. 13.39 (4th ed. 2000). Similarly, most of the instructions regarding the propositions that the State must prove for forgery differ from the pattern instructions in that they state, "so that it appeared that an event occurred which did not occur," rather than using the pattern instruction's language, "so that it appeared to have been made [(by another) (at another time) (with different provisions) (by authority of one who did not give such authority)]." Illinois Pattern Jury Instructions, Criminal, No. 13.40 (4th ed. 2000).

---

[8] For count VI, the jury was given a slightly different instruction in that the first proposition stated that defendant "knowingly made or altered a document so that it appeared to have been [made] with different provisions."

The State argues that defendant forfeited review of any alleged errors in the jury instructions, because he did not raise the issue at trial or in a posttrial motion. However, regardless of what the jury instructions state, on a challenge to the sufficiency of the evidence, we must determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789. That leads to the question of what are the essential elements of forgery.

Under the language of section 17--3, as applied to this case, the elements of forgery are: (1) a document that is apparently capable of defrauding another; (2) the defendant made or altered the document in such a manner that it purported to have been made by another person, at another time, with different provisions, or by authority of someone who did not give such authority; and (3) intent to defraud. 720 ILCS 5/17--3 (West 2002); see People v. Hockaday, 93 Ill. 2d 279, 282 (1982).

The parties note that the Committee Comments to section 17--3 state that "[t]he section involves no change in the former law of Illinois, codifying the decisions of the Illinois Supreme Court in several cases in regard to the common law and statutes on forgery in Illinois." 720 ILCS Ann. 5/17--3, Committee Comments--1961, at 408 (Smith-Hurd 2003). Where the plain language of the statute clearly expresses the legislative intent, we do not need to resort to other interpretive aids, such as Committee Comments. People v. Hari, 218 Ill. 2d 275, 295 (2006). Still, in light of the case law cited by the State, we examine its argument further.

Citing the aforementioned Committee Comments and People v. Armes, 28 Ill. 2d 83, 86 (1963), the State argues that the only elements necessary to prove forgery are that a person made a false document capable of defrauding another, with the intent to defraud. We note that Armes

pertained to a 1955 forgery statute, prior to the 1961 recodification. Armes, 28 Ill. 2d at 86. As our supreme court explained:

"Prior to the new Criminal Code separate statutes proscribed forgery of specified types of instruments or documents. ***

As presently defined in the new Criminal Code, the offense of forgery codifies and incorporates all forms of forgeries into a single crime. [Citation.] This new provision of the Criminal Code provides, in substance, that 'A person commits forgery when, with intent to defraud, he knowingly: [(1)] Makes or alters any document apparently capable of defrauding another in such manner that it purports to have been made by another *** or with different provisions, *** or (2) Issues or delivers such document knowing it to have been thus made or altered.' " People ex rel. Miller v. Pate, 42 Ill. 2d 283, 286 (1969), quoting Ill. Rev. Stat. 1965, ch. 38, par. 17--3.

The State argues that, contrary to the language of the statute, it need not have proven that the documents purported to have been made by someone else, at another time, with different provisions, or by authority of someone who did not give such authority, because "Illinois case law and [the] General Assembly in the forgery statute have included examples of the ways in which documents can be false or capable of defrauding, but those examples are intended as illustrations and not as exhaustive lists." The State cites People v. Kubanek, 370 Ill. 646, 649-50 (1939), in which the court noted that the editors of "Ruling Case Law" stated that there was no generic definition of forgery broad enough to include all forgery crimes, so legislatures had found it necessary to write such statutes broadly. Kubanek provides little support for the State's argument, as the Kubanek court

relied on the actual language of the relevant statute in arriving at its decision, and section 17--3 can similarly be interpreted as containing broad provisions.

The State maintains that its argument is also supported by other Committee Comments to section 17--3, which state: "For the same reason[,] it was deemed desirable to give an illustrative definition of 'document apparently capable of defrauding,' but not to limit it to such illustrations since the possible variations are innumerable." 720 ILCS Ann. 5/17--3, Committee Comments--1961, at 408 (Smith-Hurd 2003). According to the State, the language in section 17--3(a)(1) listing the manners in which a document may be fraudulent provides such nonexhaustive illustrations.

We believe that the State is misinterpreting the Committee Comments, as the statement it relies upon appears to refer to subsection (c). Subsection (c) states:

> "A <u>document apparently capable of defrauding</u> another includes, but is not limited to, one by which any right, obligation or power with reference to any person or property may be created, transferred, altered or terminated." (Emphasis added.) 720 ILCS 5/17--3(c) (West 2002).

The Committee Comments cited by the State refer to an "illustrative definition of 'document apparently capable of defrauding,'" and subsection (c) correspondingly gives nonexclusive examples for the definition of "document apparently capable of defrauding." Therefore, the Committee Comments do not indicate that subsection (a)(1)'s language--"in such a manner that it purports to have been made by another or at another time, or with different provisions, or by authority of one who did not give such authority"-- merely provides a few of an infinite number of examples.

The State also relies on <u>People v. Young</u>, 19 Ill. App. 3d 455 (1974). There, the defendant argued that the forgery indictment against him was insufficient because it did not specify whether the

allegedly forged stock certificate purported to have been made by someone else, at another time, with different provisions, or by authority of a person who did not give such authority. Young, 19 Ill. App. 3d at 457. The appellate court disagreed, stating:

"We view the alternatives descriptive of forgery as nondefinitional insofar as the definition of forgery is concerned. Such alternatives are by way of example--exemplative. Forgery, as we know, is a false making or alteration of an instrument which is apparently capable of defrauding another and made or altered with an intent to defraud, or, the issuance or delivery of a forged document 'knowing it to have been thus made or altered'--being subsection (2) of the forgery statute. The general rule is that an indictment which charges an offense in the language of the statute is deemed sufficient if such language particularizes the offense so that the accused is apprised of what the charge it [sic]. *** But the forgery statute does define--particularize--the elements of forgery--thus a charge which uses the same language is valid. Here, the charge was that defendant delivered a forged document with intent to defraud--whether it was made by another or with different provisions, or by the one who did not give such authority, are simply aspects of what might compromise a forged document. These aspects need not be set out in the charge. This being so, the count for forgery was sufficient." Young, 19 Ill. App. 3d at 457-58.

While the Young court held that the indictment did not have to specify in what manner the document was alleged to be a forgery, it did not hold that the proof did not have to comply with the statutory language. To the contrary, the Young court stated: "True, the subject matter of forgery must be a document altered or made and capable apparently of defrauding another 'in such a manner that it purports to have been made by another or at another time, or with different provisions, or by

authority of one who did not give such authority.' " Young, 19 Ill. App. 3d at 457.  The bill of particulars stated that the stock certificate was a forgery in that it purported to have been made by the authority of a corporation that did not give such authority (Young, 19 Ill. App. 3d at 457), and the State presented evidence of this lack of authority at trial (Young, 19 Ill. App. 3d at 460).

In contrast to the State's arguments, we note that in Hockaday our supreme court stated:

"The appellate court in this case properly identified the five elements of the forgery-by-delivery offense as follows:

'(1) a document apparently capable of defrauding another; (2) a making or altering of such document by one person in such manner that it purports to have been made by another; (3) knowledge by defendant that it has been thus made; (4) knowing delivery of the document; and (5) intent to defraud.' " (Emphasis added.) Hockaday, 93 Ill. 2d at 282, quoting People v. Hockaday, 100 Ill. App. 3d 762, 765 (1981).

Thus, Hockaday recognized that the manner in which a document is a forgery is an element of the crime.  This court has since cited Hockaday in setting forth the elements of forgery.  See People v. Hunter, 331 Ill. App. 3d 1017, 1026 (2002) (listing same elements as "[t]he essential elements necessary to prove forgery in this case," on a challenge to the sufficiency of the evidence); People v. Bokuniewicz, 160 Ill. App. 3d 270, 273 (1987).

The State points out that the Hockaday court stated that, "[i]n charging that the check 'purported to have been made by another,' the information describes the type of fraudulent character that the check possessed." (Emphasis added.) Hockaday, 93 Ill. 2d at 284.  Therefore, argues the State, the court acknowledged that other types of fraudulent character were possible.  We agree, in that, as the statute specifies, the document may also purport to have been made "at another time, or

with different provisions, or by authority of one who did not give such authority." 720 ILCS 5/17--3(a)(1) (West 2002).

In sum, we have determined that, in order to obtain a conviction of forgery, the State was required to prove that, with the intent to defraud, defendant knowingly made or altered a document that was capable of defrauding another in that it purported to have been made by another person, at another time, with different provisions, or by authority of someone who did not give such authority. 720 ILCS 5/17--3 (West 2002). We now discuss whether the State met its burden. Defendant argues that there was no evidence that his letter purported to have been made (1) by another person, (2) at another time, (3) with different provisions, or (4) by authority of one who did not give such authority.

We begin our analysis with count IV, which involved writing the March 29, 1999, letter. The letter clearly did not purport to have been made by a person other than defendant. It also did not purport to have been made on another date or by someone else's authority. The State argues that the letter qualifies as purporting to have been made with different provisions. The State cites People v. East-West University, Inc., 163 Ill. App. 3d 44 (1987), as support. There, the defendants were charged with forgery in that, with the intent to defraud, they made documents capable of defrauding another in that the documents purported to have been made with different provisions. East-West University, Inc., 163 Ill. App. 3d at 46. The indictments described the documents as " 'all documentation required to receive Basic Educational Opportunity Grant funds,' 'Illinois State Scholarship Certifications,' and 'documentation required to receive Illinois Board of Higher Education Grant funds.' " East-West University, Inc., 163 Ill. App. 3d at 46. The documents allegedly " "contained the names and credit hours of students, enrolled at East-West University, who were entitled' " to the grant funds even though the defendants " 'knew that the documentation contained

-22-

the names of persons who were not entitled to said funds.' " East-West University, Inc., 163 Ill. App. 3d at 46. The defendants argued that the conduct alleged in the indictments did not constitute forgery. The court disagreed, stating:

"Essentially, the indictments in the case at bar alleged that defendants falsified enrollment and registration data at East-West University in order to obtain educational grant funds for persons who were not entitled to them. We experience no difficulty in concluding that this conduct, if proved, constitutes forgery, which has been succinctly defined as 'a false making or alteration of an instrument which is apparently capable of defrauding another and made or altered with an intent to defraud.' " (Emphasis in original.) East West University, Inc., 163 Ill. App. 3d at 48, quoting Young, 19 Ill. App. 3d at 457.

East-West University is distinguishable from the instant case because the documents at issue in East-West University included "Illinois State Scholarship Certifications" and "falsified enrollment and registration data" that were used to try to obtain education grants for people who were not entitled to them. In this sense, the documents could have been capable of defrauding another in that they purported to have been made with different provisions, i.e., listing people on the certifications and registration data who did not qualify for grants, in that way changing the certifications and data from the originals. Count IV, in contrast, involves a self-authored letter in which defendant allegedly made a false statement or false statements of fact, but the letter itself did not purport to have been made with different provisions; unlike in East-West University, defendant was not alleged to have changed any original document.

To the extent that East-West University may have involved merely false statements, we disagree with the court's rationale. The East-West University court relied on the "succinct" definition

of forgery from Young, which did not specify that the document had to purport to have been made by someone else, at another time, with different provisions, or by authority of someone who did not give such authority. East West University, Inc., 163 Ill. App. 3d at 48, quoting Young, 19 Ill. App. 3d at 457. However, Young involved the sufficiency of just an indictment for forgery, and, as discussed, even if the State is not required to specify in an indictment how a document was capable of defrauding another, the proof at trial must show that the document has a type of fraudulent character specified in the statute. As mentioned, this is a concept that the Young court itself recognized. See Young, 19 Ill. App. 3d at 457 ("True, the subject matter of forgery must be a document altered or made and capable apparently of defrauding another 'in such a manner that it purports to have been made by another or at another time, or with different provisions, or by authority of one who did not give such authority' "). Thus, the State's reliance on East-West University is not persuasive.

The other cases relied on by the State are easily distinguishable in that they involve documents that purported to have been made by authority of someone who did not give such authority, which falls under section 17--3. See People v. Mau, 377 Ill. 199, 207 (1941) (the defendant was alleged to have exceeded his authority by making a false special assessment disbursement sheet); Kubanek, 370 Ill. at 648 (the defendant made a check payable to himself, without the authority of the check owner); People v. Murrah, 255 Ill. App. 3d 742, 746-47 (1993) (the defendant added his name to a corporate credit card application form without his boss's permission); People v. Moyer, 1 Ill. App. 3d 245, 249 (1971) (the defendant signed a fictitious name to a sales receipt and falsely asserted the authority to use his stepfather's credit).

We have concluded that defendant's March 29, 1999, letter does not purport to have been made by another person, at another time, or by authority of someone who did not give such authority. The State's argument that it purported to have been made with different provisions is also unpersuasive. As there was insufficient evidence that the March 29, 1999, letter had a type of fraudulent character specified in section 17--3, it follows that defendant was not proven guilty of forgery in count IV beyond a reasonable doubt. We therefore reverse his conviction on count IV.

We now turn to count V. Count V alleged that defendant was guilty of forgery for, with the intent to defraud, knowingly making a document apparently capable of defrauding another, in that he submitted a copy of the March 29, 1999, letter to Del Re on August 12, 2003. As with count IV, count V alleged that the letter falsely stated that he was deputized on November 16, 1981; that Lesza requested his deputy badge in 1982, explaining that his status had been reclassified as a correctional officer; and that he worked for the warrants division, correctional division, and special details for the department between November 16, 1981, and May 1982.

Defendant's conviction on count V suffers from the same infirmity as his conviction on count IV, in that there was insufficient evidence that the faxed letter purported to have been made by someone else, at another time, or by authority of someone who did not provide authority. Further, although the faxed letter literally had different provisions from the original letter in that it was missing two sentences contained in the original letter, the difference was insufficient to sustain a conviction.

Specifically, the faxed letter eliminated the following sentences:

"During the onset of this concern I decided not to breach the subject in writing based on Sheriff Grinnell's lack of interest, and was coordinating with I.M.R.F. in an effort to determine the proper retirement date based on the September 14, 1984 date. However, after further

research it became appearent [sic] the serious impact this date has on my retirement ability and pension security under S.L.E.P. verses [sic] I.M.R.F."

Under section 17--3, as applicable here, the document must be "apparently capable of defrauding another in such a manner that it purports to have been made *** with different provisions." 720 ILCS 5/17--3(a)(1) (West 2002). In other words, the different provisions have to be material to the fraud. A contrary interpretation could lead to absurd results, in that an otherwise insignificant difference in grammar could be labeled as a different provision. See People v. McCarty, 223 Ill. 2d 109, 126 (2006) (in construing a statute, the court presumes that the legislature did not intend absurd results). The jury instructions for count VI, which explicitly alleged the different provisions, recognized this principle, as the first proposition was that defendant "knowingly made or altered a document so that it appeared to have been [made] with different provisions" and the second proposition was that defendant "did so with an intent to defraud." (Emphasis added.)

Here, even viewed in the light most favorable to the State, the omission was not apparently capable of defrauding another. It is undisputed that Del Re had a copy of the original March 29, 1999, letter in his file. In the version faxed in 2003, the first omitted sentence acknowledged that IMRF identified defendant's start date as September 14, 1984, but that fact was also brought out earlier in the same letter, when defendant stated, "In my case, they identified the S.L.E.P. start date as September 14, 1984." The first omitted sentence also conveyed that defendant did not initially challenge his start date in writing and was working with IMRF based on the 1984 start date, but those facts are undisputed and are not the basis of the fraud alleged against defendant. The second omitted sentence discussed the impact the different date would have on defendant's ability to retire and his pension security, but defendant repeated this sentiment later in the letter when he stated, "Though I

do not plan to retire from the department [in 2001], the additional months of service will have a serious impact on the financial aspect of my retirement. Lastly, to lock in my retirement on the correct date will ease the apprehension that most feel in a politically appointed position." The omitted information was largely repetitive of other portions of the letter, and it did not affect the parts of the letter that were allegedly false, i.e., the statements that defendant was deputized in 1981; had his deputy status revoked in 1982; had worked for the warrants division, correctional division, and special details for the sheriff's department between November 1981 and May 1982; and was temporarily assigned to the warrants division and to civil process during the early months of his employment. Del Re, to whom the letter was directed, even testified that he was "not sure that [defendant's omission of the sentences] meant a great deal" and that it did not cause him to feel that "anything was being put over on" him.

We further note that defendant had communicated the information from the omitted sentences directly to IMRF through his February 2000 letter to Nordstrom. In that letter, defendant stated:

"Secondly, between 1991 and the time that Sheriff Grinnell left office, on at least three occasions I spoke with him about the error and asked if he had a chance to investigate it. As I explained to Sheriff Del Re, there came a point whereas I felt that my concerns were getting ignored. Initially I was not extremely concerned with the 1984 date because I had no intentions of retiring until the age of 50. However, I have since researched and determined the impact that the 32 months would have on my overall retirement and my ability to secure my required vestage [sic] on November 16, 1981. This is the reason that I am now aggressively seeking the I.M.R.F. credits to be rightfully converted to S.L.E.P. credits."

To summarize, although the 2003 faxed version of the March 29, 1999, letter contained different provisions in that it omitted two sentences, the omission was not "apparently capable of defrauding another," because the missing sentences were not material to the fraud defendant allegedly sought to perpetrate. Moreover, in addition to being cumulative of information provided in other letters, the missing sentences were also cumulative of other, unaltered parts of the very letter at issue. Thus, there was insufficient evidence that the omission was apparently capable of defrauding another, meaning that defendant was not proven guilty beyond a reasonable doubt of forgery as charged in count V.

Based on our conclusion that defendant was not proven guilty beyond a reasonable doubt of forgery because the evidence did meet the statutory requirements, we need not address defendant's alternative arguments that the documents were not capable of defrauding another because they did not have legal efficacy and because he was truly entitled to the SLEP credit. We also do not reach his arguments that the trial court should have declared a mistrial instead of instructing the deadlocked jury to deliberate and that one of his two convictions must be vacated because they both arise out of the same act.

## III. CONCLUSION

For the foregoing reasons, we reverse the judgment of the Lake County circuit court.

Reversed.

O'MALLEY and GROMETER, JJ., concur.