NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241367-U

NO. 4-24-1367

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 29, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Adams County |
| BRIAN G. MOSLEY, | ) | No. 23CF354 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Charles H.W. Burch, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Harris and Justice Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed defendant's forgery conviction where the State proved the offense beyond a reasonable doubt and the prosecutor's closing argument was proper.

¶ 2    A jury found defendant, Brian G. Mosley, guilty of forgery (720 ILCS 5/17-3(a)(2) (West 2022)). The trial court sentenced defendant to 24 months' probation and 30 days in jail and ordered him to pay restitution in the amount of $2,146.16. Defendant appeals, challenging the sufficiency of the evidence and arguing that the prosecutor misstated the law in closing argument. We affirm.

¶ 3                          I. BACKGROUND

¶ 4                          A. Trial Evidence

¶ 5    The evidence at defendant's jury trial was essentially undisputed and showed the following.

¶ 6    Quincy Tractor LLC (Quincy Tractor) is a family-owned business based out of Quincy, Illinois, that sells and services agricultural equipment. At the time of the offense, Quincy Tractor used First Mid Bank & Trust (First Mid) for banking services. Defendant had no connection with Quincy Tractor, either as an employee or a customer.

¶ 7    On May 26, 2023, defendant went to a First Mid branch and cashed a check dated May 24, 2023, that was payable to himself from Quincy Tractor in the amount of $2,146.16. To complete that transaction, defendant informed bank employees of his Social Security number and presented his identification card. First Mid employees gave defendant $2,146.16, and he exited the bank.

¶ 8    First Mid's assistant branch manager, Jessie McKiernan, formerly Sloan, was familiar with the signature of Quincy Tractor's general manager, Zachary Carlson. Sloan noticed that Carlson's signature was different on the check defendant cashed. Upon reviewing the bank's records, Sloan also verified that the check number was sequentially inconsistent with other checks that had been cashed on Quincy Tractor's account. Sloan thus contacted Carlson, who confirmed that the check defendant cashed was fraudulent. Specifically, Carlson said that he did not sign this check, it did not contain Quincy Tractor's full business name, and it did not match the format of any checks Quincy Tractor ever used.

¶ 9    Quincy Tractor was the victim of a second check fraud around the same time frame. There was no evidence that defendant was involved in that incident.

¶ 10    The following week, Adams County sheriff's deputies located defendant. He agreed to be interviewed by two deputies but refused to allow the interview to be recorded. The deputies showed defendant photographs of himself inside the bank on May 26, 2023. Defendant admitted to cashing the subject check and, according to Deputy Zachary Drebes, related the

following about the circumstances surrounding that transaction. Defendant was outside his apartment when two males showed up in an SUV and asked him if he wanted to make some money. He needed money because the power to his apartment had been shut off. The two males told defendant they had a check that needed to be cashed and they would give him between $500 and $1,000 if he did that for them. The two males told defendant they could not cash the check themselves because "it was due to [an] illegal immigrant working in the area and they did not have an account to cash the check." When defendant got in the SUV, the two males took a picture of defendant's identification card before giving it back to him. The three of them then drove to a grocery store parking lot in Hannibal, Missouri, where one of the males exited the vehicle. A short time later, that individual returned and switched seats with defendant, and then the men drove to First Mid's location in Quincy. Defendant entered the bank and cashed the check. The two males then picked up defendant, and he gave them the money. The trio drove to a different location. The two males asked defendant to cash another check for them. Defendant responded that he "didn't want anything to do with this." A verbal disagreement ensued, and one of the males "pulled a handgun" on defendant before releasing him from the SUV. Defendant told Drebes he did not make any money from cashing the check.

¶ 11        Deputy John Schone testified that defendant claimed that the individuals who provided him the check "had parked down the block away from him in an alley." Schone testified that the First Mid branch where defendant cashed the check was at "Seventh and Hampshire," and Schone believed the alley defendant referenced was "on Seventh Street." Thus, it seems from Schone's testimony that defendant told the deputies that the two males who gave him the check parked in an alley while defendant cashed it.

¶ 12        The deputies apparently were unable to locate the individuals defendant claimed

recruited him to cash the check. However, the deputies identified the person who cashed the other fraudulent check on Quincy Tractor's account around the same time frame. That person provided an account that was "similar" to the information defendant related, though the specifics of that conversation were not provided at defendant's trial.

¶ 13                                 B. Closing Arguments

¶ 14          To sustain the forgery charge as alleged in the indictment, the State had to prove that defendant, with intent to defraud, knowingly delivered a document to First Mid that was apparently capable of defrauding another and defendant knew the document was false. See 720 ILCS 5/17-3(a)(2) (West 2022); *People v. Lawson*, 2015 IL App (2d) 140604, ¶ 19. The only disputed issue was whether defendant had the requisite *mens rea* to commit forgery: specifically, whether defendant knew the subject check was a false document and therefore acted with intent to defraud when he cashed it.

¶ 15          On appeal, defendant argues that the prosecutor misstated the law in closing argument and that defense counsel repeated the misstatement without correcting it. Accordingly, it is necessary to recite the most relevant portions of the parties' closing arguments.

¶ 16                          1. *The State's Initial Closing Argument*

¶ 17          The prosecutor informed the jury that the State needed to prove that (1) "defendant knowingly delivered a false document, which he knew had been made or altered so that it appeared to have been made by another," (2) "he did so with the intent to defraud," and (3) "the document was capable of defrauding another."

¶ 18          With respect to whether defendant knew the check he cashed was a false document, the prosecutor argued as follows:

          "We have the statements that the defendant gave to the detectives or investigators

- 4 -

that he had met two guys off the street, they offered him some cash to go cash a check for another person, that they took a picture of his driver's license, that they then went to Hannibal and were given a check by a third party there at a parking lot. Does any of that sound legit? Does any of that sound like a true document was created?

He was then brought back to Quincy where he was—parked the car and told them to go into the bank and cash it while they stayed in the vehicle and didn't go in. One of the things the judge is going to describe to you is you are allowed to make reasonable inferences as to certain things. And one of those reasonable inferences is based on the evidence would it be reasonable to have this belief and that here the defendant should have known or that he knew that the document was made or altered to be a false document. So we have a number of pieces of evidence here that I believe can become a reasonable inference that he knew the document was false."

¶ 19    Later, addressing whether defendant acted with intent to defraud, the prosecutor argued:

"The defendant doesn't come out and say I wanted to defraud some people. Again, we can make reasonable inferences as to his intent as to what he was thinking when he was doing this. We have him going into the bank with this check, and he was told that *** if he did this he was going to get $500.00 And he went in, and he cashed that check, and he walked out with $2,146.00 in his hand.

Now again, the reasonable inferences are drawn from the facts—the totality of the facts that we have, and those totality of facts show that the defendant knew

the document was falsely made and that he—in doing this, he knew that he didn't have permission to have that check. He never worked for Quincy Tractor. He had no reason to be given $2,000.00 on that day."

¶ 20    In the course of summarizing the State's position, the prosecutor later returned to the issue of *mens rea* and asserted the following:

"[Defendant], from his own statements to the police, he knew that these people were going to pay him money to cash a check or that was supposedly going to be made to possibly an illegal immigrant. Whatever the reason, he had a check in his hand that he did not earn, he did not make, that he knew was false, that he took that then and delivered it to another person. That's again delivery of a false document that was capable of defrauding another."

¶ 21    2. *Defense Counsel's Closing Argument*

¶ 22    Defense counsel's central theme in his closing argument was that defendant did not know the check he delivered was fraudulent and did not intend to defraud anybody. Counsel made the following points:

• defendant, who was unfamiliar with Quincy Tractor's operations and personnel, could not be expected to recognize from the face of the check that it was fraudulent;

• it was reasonable to assume that defendant believed the person who wrote the check had authority to do so on behalf of Quincy Tractor;

• defendant openly walked into a bank with cameras and presented his identification card to a teller, and he later cooperated with law enforcement;

• another person told the deputies "the same story" about being recruited to cash a Quincy Tractor check;

• there was no evidence about defendant's "level of education or how smart he is to recognize that this was a fraudulent check or that this was just some scheme that these two guys were doing";

• defendant, who was "vulnerable" due to his poverty, was a "pawn" and "victim" of the men who asked him to cash the check; and

• once defendant recognized that the men who recruited him were operating a scam, he refused to cash a second check for them and was then threatened at gunpoint.

¶ 23      Defense counsel also proposed that the State's case was built on assumptions:

"The State's asking you to use circumstantial evidence to say, well, he should have known. In fact, he should have known it was a fraud. I won't go what I was going to say, but the State is asking you to use circumstantial evidence to essentially assume what he knew. The problem with assumptions is that sometimes they are wrong."

Counsel later reiterated that the State was assuming defendant "knew that there was some sort of fraudulent scheme going on," even though defendant "had no way to know" this and it was "impossible for the State to prove what [defendant's] intent was." Ultimately, counsel proposed that, rather than intending to defraud anyone, defendant merely "intended to cash a check that he believed was a valid check written out to him."

¶ 24                         *3. Rebuttal Closing Argument*

¶ 25      In rebuttal closing argument, the prosecutor maintained that it was unfair for defense counsel to say "it is impossible to prove intent," as the jury's job was "to make reasonable inferences as to why the defendant did what he did." The prosecutor conceded that defendant was a "pawn" who was "used" by the people who recruited him. Nevertheless, the prosecutor proposed

defendant was "a knowing and accepting pawn." On this point, the prosecutor argued:

"He did this because he wanted $500.00, not because he wasn't smart enough to understand what was going on. He wanted some money. They said, 'Do this for us, and we will give you $500.00.' Now what they were asking him to do was forgery. They were asking him to deliver this false document to the bank and get some cash.

Now what reasonable inference can we draw here when someone comes up to you off the street that you have never met in your life and says, 'Hey, why don't you go cash this check for us.' Does that sound like a legitimate business transaction? And they say, 'Hey, we're going to give you cash money if you take this check that you didn't earn into a business you've never been to before, and you take it to the bank and you go cash it. We'll give you cash.' Does that sound like something people just do without knowing why, or did you know that this was a fraud? Did you know that this—what you were doing, this check that you were holding in your hand, was fake, and you didn't earn it, you didn't work for this company, you didn't return product to the company and get a refund, you didn't do anything with Quincy Tractor. These two individuals came to your house and said, 'Go cash this check. I will give you cash if you go.' Yeah, I'll do that. That's what [defendant] did that day. He went there, and he cashed that check knowing that it was false, knowing that he was ripping somebody off somewhere, whether it was Quincy Tractor, whether it was the bank, whether it was somebody else. He knew he hadn't earned that money. He knew that that check that he got in a parking lot in Hannibal is not something that he had any right to."

¶ 26    The prosecutor then noted that defendant had the motivation to commit the charged

offense because "[h]is power had just been turned off" and "[h]e needed cash now." Although this made defendant "vulnerable" to being preyed upon by others, a person who knowingly commits a crime still must "be found guilty of that crime."

¶ 27        The prosecutor argued that contrary to what defense counsel suggested, the State was not asking the jury to make assumptions. Rather, the State wanted the jury to "make a reasonable deduction as to [defendant's] intent" based on all the evidence.

¶ 28        The prosecutor concluded by saying the following:

"Defense counsel says that anyone can write a check and give you a check. And it's true, people can write—anyone can write a check and give it to you, but when it's a check you haven't earned you have to ask yourself why am I getting this check, why am I being asked to go about cashing it in this manner? They are telling you it's for some other person, cashing a check for some other person, but it's got my name on it. These are things that you can use to make a reasonable inference.

The defendant knew what he was doing was wrong, that he was defrauding other people. Now whether he was smart or not, we haven't heard any evidence of that, but what we have heard was that he took that check, he voluntarily walked into the bank with that check, and he walked out of the bank with that money.

So I am asking you today to find the defendant has committed forgery, that he has knowingly delivered a false document, that he delivered that with the intent to defraud, and that document was capable of defrauding. I am asking you to find that all three of these propositions have been proven beyond a reasonable doubt and that this defendant is guilty of forgery. Thank you."

¶ 29                     C. Instructions and Verdict

¶ 30        The trial court instructed the jury that the State had to prove (1) "defendant knowingly delivered a false document which he knew had been made or altered so that it appeared to have been made by another," (2) "defendant did so with the intent to defraud," and (3) "the document was apparently capable of defrauding." The court did not provide definitions of either knowledge or intent. The jury found defendant guilty.

¶ 31                          D. Posttrial Matters

¶ 32        In his posttrial motion, defendant challenged the sufficiency of the evidence but did not argue that the prosecutor misstated the law in closing arguments. The trial court denied the motion. The court sentenced defendant to 24 months' probation and 30 days in jail and ordered him to pay restitution to First Mid in the amount of $2,146.16. Defendant timely appealed.

¶ 33                              II. ANALYSIS

¶ 34                      A. Sufficiency of the Evidence

¶ 35        Defendant first challenges whether the State proved him guilty of forgery beyond a reasonable doubt. He concedes the evidence showed that (1) he knowingly delivered a check to First Mid, (2) the check was a false document, and (3) the check was apparently capable of defrauding First Mid. However, defendant maintains that the State failed to prove he possessed the requisite *mens rea* for the offense, specifically, that he knew the check was a false document when he cashed it and therefore acted with intent to defraud.

¶ 36        "Where a criminal conviction is challenged based on insufficient evidence, a reviewing court, considering all of the evidence in the light most favorable to the prosecution, must determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime." *People v. Brown*, 2013 IL 114196, ¶ 48. This standard reflects

that the trier of fact is tasked with resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences. *Brown*, 2013 IL 114196, ¶ 48. A reviewing court will not substitute its judgment on questions involving weighing evidence or assessing witness credibility. *Brown*, 2013 IL 114196, ¶ 48. Nevertheless, a reviewing court must reverse the judgment "where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Brown*, 2013 IL 114196, ¶ 48.

¶ 37　　　　Absent a confession, the State will rarely have access to direct evidence that a defendant possessed the knowledge and intent required to sustain a forgery conviction. Accordingly, the *mens rea* for forgery often must be inferred "from the facts and circumstances surrounding" the defendant's actions. *People v. Hunter*, 331 Ill. App. 3d 1017, 1026 (2002). However, any inferences regarding a defendant's state of mind must be reasonable and " 'based on established facts.' " *People v. Hinton*, 402 Ill. App. 3d 181, 185 (2010) (quoting *People v. Pinta*, 210 Ill. App. 3d 1071, 1078 (1991)).

¶ 38　　　　Defendant argues that the trial evidence did not reasonably support an inference that he knew the check he presented to First Mid was a false document. Section 4-5(a) of the Criminal Code of 2012 (720 ILCS 5/4-5(a) (West 2022)) provides:

"A person knows, or acts knowingly or with knowledge of:

(a) The nature or attendant circumstances of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that his or her conduct is of that nature or that those circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that the fact exists."

¶ 39　　　　In challenging the sufficiency of the evidence, defendant mentions the following

- 11 -

points. He lacked familiarity with Quincy Tractor's operations, so he was not in a position to recognize there was a problem with the check. Moreover, he did not attempt to conceal his identity at the bank but instead provided his own name, identification card, and Social Security number. Thus, his actions inside the bank did not reflect "suspicious or inculpatory behavior." He also cooperated with law enforcement, which further suggests an absence of consciousness of guilt. Although defendant acknowledges the evidence might support a conclusion that he "should have known something improper was happening" before he cashed the check, he proposes the evidence does not reasonably support the required inference that he "had a conscious awareness *** that the check he was given was false." See *People v. Nash*, 282 Ill. App. 3d 982, 986 (1996) (explaining that " '[k]nowledge' is not the same as 'should have known' " for purposes of evaluating *mens rea* in criminal cases). To that end, defendant asserts that the individuals who recruited him to cash the check appeared to have the authority to write a check to him for purposes of paying an illegal immigrant worker.

¶ 40    We hold that the evidence reasonably supported an inference that defendant knew the check he presented to First Mid was a false document. Defendant had no connection with Quincy Tractor. Nevertheless, he cashed a check, which turned out to be fraudulent, made out to himself from Quincy Tractor. When deputies confronted defendant about this a week later, he explained that two unknown individuals encountered him outside his apartment and recruited him to cash a check in exchange for between $500 and $1,000. In closing arguments, defense counsel characterized defendant as an unwitting participant in the check-cashing scheme, as he may not have been educated or smart enough to recognize the fraud until after he cashed the check. However, the jury reasonably rejected that argument, as it was based on speculation, without any basis in the evidence. Notably, there was no evidence regarding defendant's educational

background or intellect. Additionally, so far as the evidence showed, defendant never specifically told the deputies that he believed what the individuals said to him or that he thought he had a legal right to cash the check.

¶ 41　　　　Additionally, the trial court instructed jurors to "consider all the evidence in light of [their] own observations and experiences in life." See Illinois Pattern Jury Instructions, Criminal, No. 1.01[10] (approved Feb. 1, 2021). Thus, in assessing whether defendant knew he was being recruited to cash a false check, the jury was entitled to consider that the circumstances defendant described to law enforcement officers were blatantly inconsistent with any legitimate business transaction and reeked of fraud. For example, defendant told deputies that the individuals who recruited him said something about an illegal immigrant who lacked an account to cash a check. However, that does not explain why these individuals would write a check to defendant, who was a complete stranger, rather than just withdrawing cash to pay the immigrant. The jury was also entitled to consider that defendant told deputies that these individuals (1) offered him a large sum of money just to cash a check, (2) took a picture of his identification card, (3) stopped at a grocery store parking lot before proceeding to the bank, and (4) parked in an alley while defendant entered the bank to cash the check. In evaluating whether these circumstances justified an inference that defendant knew he was being recruited to cash a false check, the jury was not required to leave its common sense at the courthouse door or speculate that defendant was oblivious to the obvious.

¶ 42　　　　Although another person who defrauded Quincy Tractor during the same time frame apparently told the deputies a story that was similar to defendant's, the jury was not required to accept that every word defendant told the deputies was true or represented everything he knew about the events at issue. The trial court instructed the jury that it needed to consider (1) whether

defendant made the statements attributed to him, (2) if so, what weight should be given to the statements, and (3) the circumstances under which the statements were made. See Illinois Pattern Jury Instructions, Criminal, Nos. 3.06-3.07 (approved Oct. 17, 2014). Assuming the jury believed defendant's claim that he was threatened at gunpoint when he refused to cash a second check, the jury might have found it noteworthy that defendant did not report this crime until deputies detained him for questioning a week later. Of course, defendant would have little incentive to seek recourse from the police for this assault if he had knowingly cashed a fraudulent check for the individuals who assaulted him.

¶ 43        Defendant mentions that he did not attempt to conceal his identity when he entered the bank to cash the check but, rather, provided his Social Security number and identification card to the teller. Defendant interprets these actions as indications that he did not know the check was false when he cashed it. However, a different reasonable inference from the evidence is that defendant did not anticipate having to provide his personal information to the teller to cash the check, which could explain why he purportedly later told the individuals who recruited him that he "didn't want anything to do with this" when they wanted him to cash another check for them. Defense counsel seemingly construed this remark in his closing argument as meaning that defendant suddenly realized after he cashed the check that the other individuals were committing fraud. But there was no evidence about what might have caused defendant to have such an epiphany at that moment.

¶ 44        Defendant likens his lack of suspicious or inculpatory behavior at the bank to the circumstances in *People v. Cohen*, 343 Ill. 437, 442-43 (1931), where our supreme court reversed a forgery conviction for lack of evidence that the defendant knowingly attempted to cash a false check. As defendant acknowledges in his reply brief, *Cohen* was decided before our supreme court

adopted the current standard of review for evaluating the sufficiency of evidence. More fundamentally, the facts of *Cohen* are distinguishable. In that case, the defendant attempted to cash a check made out to him that was drawn on the account of " 'Homer Brothers, Inc.' " *Cohen*, 343 Ill. at 438. Although the check itself was a genuine blank check used by the corporation, it was unknown who signed the words " 'Homer Bros.' " on this check. *Cohen*, 343 Ill. at 438, 442. Louis Homer testified for the prosecution that although he did not sign this check, the corporation indeed customarily signed its checks " 'Homer Bros.' " *Cohen*, 343 Ill. at 438. Defendant testified that someone named George Homer gave him the check as payment for alcohol. *Cohen*, 343 Ill. at 440. In reversing the conviction, our supreme court reasoned that (1) there was no evidence that George was not one of the "brothers" connected with the company, (2) the subject check itself was genuine and signed in the manner customary to the company, and (3) the defendant presented his own identification when attempting to cash the check and did not attempt to flee when confronted. *Cohen*, 343 Ill. at 442-43. Here, by contrast, the check that defendant cashed was not an actual check used by Quincy Tractor, and the person who purportedly signed the check on behalf of Quincy Tractor testified that his signature was forged. Thus, unlike in *Cohen*, the evidence did not give rise to the distinct possibility that the check defendant cashed reflected a valid payment to him from Quincy Tractor. Under these circumstances, *Cohen* is distinguishable and does not support reversing defendant's conviction.

¶ 45            Defendant further asserts that his cooperation with law enforcement officers showed an absence of consciousness of guilt. That reasoning is not particularly persuasive, considering that defendant did not speak with the deputies until after they possessed photographs given to them by First Mid confirming that defendant was the person who cashed the false check. At that point, defendant's only options were either to remain silent or attempt to justify his actions.

That defendant chose the second option does not necessarily mean he lacked consciousness of guilt.

¶ 46        Ultimately, it was for the jury to interpret and weigh the evidence and to draw reasonable inferences about defendant's state of mind when he cashed the false check. "In weighing evidence, the trier of fact is not required to disregard inferences that flow normally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Cline*, 2022 IL 126383, ¶ 41. We cannot say that the evidence was "so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt" as to whether defendant knew the check was false when he cashed it. *Brown*, 2013 IL 114196, ¶ 48.

¶ 47        Defendant's argument about lack of intent to defraud is premised on the same proposal that the State failed to prove he knew the check he cashed was a false document. Having rejected that premise, there is nothing left for us to consider with respect to this issue. See *Hunter*, 331 Ill. App. 3d at 1026 (asserting that if a jury can reasonably conclude that a defendant knowingly presented a false check, the defendant's "intent to defraud is presumed").

¶ 48                          B. The Prosecutor's Closing Argument

¶ 49        Defendant also argues that the State denied him a fair trial where the prosecutor inaccurately argued that the jury could infer knowledge because defendant "should have known" the check he cashed was false. In presenting this argument, defendant focuses primarily on the following comments the prosecutor made in his initial closing argument:

> "One of the things the judge is going to describe to you is you are allowed to make reasonable inferences as to certain things. And one of those reasonable inferences is based on the evidence would it be reasonable to have this belief and that *here the*

*defendant should have known or that he knew that the document was made or altered to be a false document.* So we have a number of pieces of evidence here that I believe can become a reasonable inference that he knew the document was false." (Emphasis added.)

Defendant maintains that this was not an isolated misstatement of the law, "but rather formed the crux of the State's argument on the element of knowledge." On this point, defendant reasons that the prosecutor (1) argued in the initial closing that the scenario defendant described did not sound "legit" and (2) suggested in rebuttal that someone in defendant's situation would have to question why he or she was being given a check and asked to cash it. Defendant acknowledges he forfeited this issue by failing to raise it below. To circumvent forfeiture, he invokes the first prong of the plain-error doctrine and alleges ineffective assistance of counsel.

¶ 50          The State responds that, viewed in isolation, the prosecutor's use of the phrase "should have known" "reflects a lesser mental state akin to recklessness or negligence, not knowledge." However, according to the State, when viewed in context and taken as a whole, the prosecutor correctly argued that defendant knowingly delivered a forged check. Thus, the prosecutor "did not misstate the law or invite conviction on an improper mental state." Even assuming that the prosecutor misstated the law, the State proposes that such error was (1) corrected by defense counsel's references to defendant's lack of knowledge, (2) clarified during the prosecutor's rebuttal argument, and (3) cured by jury instructions. The State also argues that the evidence was not closely balanced, so there could be no first-prong plain error. Finally, the State maintains that defendant's ineffective-assistance claim fails because the jury was properly instructed and defendant sustained no prejudice.

¶ 51          "Generally, prosecutors have wide latitude in the content of their closing

arguments." *People v. Jackson*, 2020 IL 124112, ¶ 82. It is proper for a prosecutor to comment on the evidence and reasonable inferences drawn therefrom, "even if the suggested inference reflects negatively on the defendant." *Jackson*, 2020 IL 124112, ¶ 82. However, "the State is not allowed to misstate the law or facts of the case, and it is not allowed to diminish its burden of proof." *People v. Carbajal*, 2013 IL App (2d) 111018, ¶ 29. In evaluating the propriety of a closing argument, "[a] reviewing court will consider the closing argument as a whole, rather than focusing on selected phrases or remarks." *Jackson*, 2020 IL 124112, ¶ 82. The reviewing court must consider any challenged remark in context. *People v. Wheeler*, 226 Ill. 2d 92, 122 (2007).

¶ 52 To preserve an issue regarding closing arguments for appellate review, a defendant must contemporaneously object to the prosecutor's remark and then raise the issue again in a posttrial motion. *People v. Mudd*, 2022 IL 126830, ¶ 21. Because defendant failed to preserve the issue, he argues both that the first prong of the plain-error doctrine applies and that he received ineffective assistance of counsel.

¶ 53 1. *First-Prong Plain Error*

¶ 54 The plain-error doctrine is "a narrow exception to the rule of procedural default for unpreserved errors." *People v. Williams*, 2022 IL 126918, ¶ 48. To obtain relief pursuant to the first prong of the plain-error doctrine, a defendant "must show that the evidence was closely balanced and that the prosecutor's comments were clear or obvious reversible error that changed the outcome of the trial." (Internal quotation marks omitted.) *Mudd*, 2022 IL 126830, ¶ 22. Commentary during closing argument constitutes reversible error "only if the defendant demonstrates that the remarks were improper and that they were so prejudicial that real justice was denied or the verdict resulted from the error." *Jackson*, 2020 IL 124112, ¶ 83. In other words, to establish prejudice, a defendant alleging first-prong plain error must show that the prosecutor's

improper comments had "some probable bearing on the result" and were damaging enough to severely threaten to tip the scales of justice against the defendant. *Williams*, 2022 IL 126918, ¶ 57.

¶ 55    The first step in a plain-error analysis is to determine whether the prosecutor made improper comments that would have constituted reversible error had the issue been preserved for appeal. *Williams*, 2022 IL 126918, ¶ 49. For the following reasons, we hold that the prosecutor's closing argument did not constitute reversible error. Thus, defendant has not shown his entitlement to relief under the first prong of the plain-error doctrine, and we need not consider the parties' dispute about whether the evidence was closely balanced.

¶ 56    The prosecutor never expressly argued that defendant could be found guilty if he was either reckless or negligent in failing to recognize that he was recruited to cash a false check. Quite the opposite. At the beginning of the prosecutor's initial closing argument, he acknowledged the State needed to prove that (1) "defendant knowingly delivered a false document, which he knew had been made or altered so that it appeared to have been made by another," (2) "he did so with the intent to defraud," and (3) "the document was capable of defrauding another." These propositions were legally accurate and mirrored the instructions the trial court ultimately provided.

¶ 57    Nevertheless, defendant maintains that the prosecutor effectively reduced his burden of proof by conflating defendant's actual knowledge with what he should have known. Defendant is correct that "should have known" is different from "knowledge." See *Nash*, 282 Ill. App. 3d at 986 (explaining that " 'should have known' " suggests either recklessness or negligence rather than knowledge). However, despite improvidently using the phrase "should have known" once, the prosecutor never specifically tied that phrase to the elements the State had to prove by asserting that the jury could find defendant guilty merely because he should have known the check was a false document. That distinguishes this case from *Nash*, where the prosecutor expressly

- 19 -

asserted during closing argument that " 'knowledge in this case means knew or should have known' " and the trial court then applied that incorrect standard in finding the defendant guilty. *Nash*, 282 Ill. App. 3d at 986.

¶ 58   In determining no reversible error occurred, we also consider that the prosecutor repeatedly made clear the State's theory was that defendant *knew* the check he cashed was false. For example, right after the prosecutor used the phrase "should have known," he said it was a reasonable inference from the evidence that defendant "knew the document was false." In the context of the entire closing argument and the instructions the trial court provided, the prosecutor's use of the phrase "should have known," while inadvisable, did not introduce confusion about the State's burden of proof.

¶ 59   Defendant notes that the prosecutor also (1) asked the jury to consider whether the facts that defendant related to the deputies sounded "legit" and (2) suggested that someone in defendant's position had to question the circumstances. We deem these remarks proper. The prosecutor was entitled to comment on the reasonable inferences to be drawn from the evidence. One such inference was that it was implausible that defendant failed to recognize before he cashed the check that he was recruited to participate in a fraud. In the comments defendant identifies, the prosecutor was appropriately asking the jury to make inferences about what defendant knew, not asking the jury to find defendant guilty based on what he should have known.

¶ 60   The prosecutor's closing argument did not contain "clear or obvious reversible error that changed the outcome of the trial." (Internal quotation marks omitted.) *Mudd*, 2022 IL 126830, ¶ 22. The prosecutor's isolated use of the phrase "should have known" was not "so prejudicial that real justice was denied or the verdict resulted from the error" (*Jackson*, 2020 IL 124112, ¶ 83), and the prosecutor's closing argument was otherwise appropriate. Accordingly, defendant is not

entitled to relief under the first prong of the plain-error doctrine.

¶ 61                            2. *Ineffective Assistance of Counsel*

¶ 62            To obtain relief based on ineffective assistance of counsel, a defendant must show both that trial counsel performed deficiently and that such deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). With respect to the deficiency requirement, the United States Supreme Court has cautioned that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. A reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and that the challenged action was sound trial strategy. *Strickland*, 466 U.S. at 689. As to *Strickland*'s second requirement, prejudice means "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 63            To the extent defendant argues his counsel was ineffective for failing to object to the prosecutor's closing argument, that issue fails because the prosecutor's argument was not reversible error, as explained above. See *Jackson*, 2020 IL 124112, ¶ 91 (explaining that where a prosecutor's remarks did not constitute reversible error, a claim of ineffective assistance based on failure to preserve a challenge to those remarks necessarily failed).

¶ 64            Beyond the failure to object, defendant argues that his counsel's closing argument amounted to ineffective assistance. According to defendant, counsel was ineffective for repeating

the State's argument without correcting it, which could be construed as "suggesting to the jury that they should accept" the incorrect standard the prosecutor argued. In presenting this argument, defendant focuses on the following remarks in defense counsel's closing argument:

> "The State's asking you to use circumstantial evidence to say, well, he should have known. In fact, he should have known it was fraud. I won't go what I was going to say, but the State is asking you to use circumstantial evidence to essentially assume what he knew. The problem with assumptions is that sometimes they are wrong."

¶ 65    We hold that defendant has failed to satisfy either prong of *Strickland*. As explained above, the prosecutor did not ask the jury to apply an incorrect standard with respect to assessing *mens rea*. Thus, with the comments defendant identifies, defense counsel did not invite the jury to accept the prosecutor's incorrect standard. Moreover, viewing defense counsel's closing argument in its entirety, it is clear that counsel emphasized the State's purported failure to prove that defendant actually knew he was recruited to participate in a fraud. Nothing in defense counsel's argument can be interpreted as suggesting that defendant would be guilty of forgery if he merely should have known the check was false. Accordingly, defense counsel did not perform deficiently, and defendant cannot demonstrate prejudice from any deficiency.

¶ 66                                III. CONCLUSION

¶ 67    For the reasons stated, we affirm the trial court's judgment.

¶ 68    Affirmed.